# **Exhibit B** to

# Motion for Limited Relief from the Automatic Stay:

# *"Purchaser's Response"*

## CAUSE NO. DC-21-01658

| | | |
|---|---|---|
| **AIWA HOLDINGS, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **DALLAS COUNTY, TEXAS** |
| | § | |
| **AIWA CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | **44TH JUDICIAL DISTRICT** |

### AIWA HOLDINGS, LLC'S RESPONSE TO DEFENDANT AIWA CORPORATION'S VERIFIED EMERGENCY MOTION TO SET ASIDE UNAUTHORIZED SALE AND MOTION TO DISCHARGE RECEIVER

**Aiwa Holdings, LLC** ("Plaintiff" or "Aiwa Holdings") files this response to Defendant Aiwa Corporation's Verified Emergency Motion to Set Aside Unauthorized Sale and Motion to Discharge Receiver ("Motion"), and in support respectfully shows the Court as follows:

### I.
### INTRODUCTION

Aiwa Corporation's ("Borrower" or "Defendant") actions in this case are both baffling and breathtaking. Based on Borrower's own pleadings and supporting evidence, it has blatantly violated the agreed receivership order in this case by purporting to sell assets under the exclusive control of the Receiver and hiding the transaction from the Receiver (on advice of counsel, no less). Borrower then has the audacity to ask this Court to set aside a sale, the terms of which were first presented to Defendant's counsel prior to the most recent status conference, which sale was then raised again and discussed in open court, all with no objection raised, in favor of the alleged sale consummated in direct violation of the receivership order. The sale of the assets by the Receiver represents a valid and binding obligation duly authorized by the Receiver and under the terms of the Receivership Order. The Court should flatly reject Borrower's wholly improper, factually inaccurate and legally meritless Motion and, to the extent required, confirm the Receiver's sale of the receivership assets.

## II.
### BACKGROUND

Effective January 4, 2021, Borrower voluntarily entered into a Forbearance Agreement with Fairlane Fund One, LP and Fairlane Fixed Income Fund LLC (together, "Fairlane"). A true and correct copy of the Forbearance Agreement is attached as Exhibit 1 to Fairlane's Verified Original Petition and Agreed Ex Parte Application for Appointment of Receiver.

Under the terms of the Forbearance Agreement, Borrower acknowledged that it was in default on its obligations to Fairlane. Borrower also executed the Agreed Order Appointing Receiver ("Receivership Order") and agreed that Fairlane could submit the order to a court of competent jurisdiction upon the earlier of a default by Borrower under the Forbearance Agreement or the expiration of the forbearance period. This is precisely why the order is styled an *Agreed* Order Appointing Receiver. Borrower attempts to obscure this fact when it says, "the Original Lenders sought and obtained an order appointing a receiver over the Company's assets…." Motion at 1.

When the forbearance period expired, Fairlane filed this lawsuit and presented the Receivership Order for entry. The Court entered the Receivership Order (which was consented to by both Borrower's Chairman of the Board and its Chief Executive Officer), and which specifically appointed Pascal Garbani as the Receiver, on February 8, 2021. Thereafter, Borrower ratified the enforceability of the Receivership Order when it filed a motion purportedly seeking to enforce the order on April 2, 2021.

The Receivership Order placed the Collateral (as defined in the order) under the exclusive control of the Receiver and authorized the Receiver to dispose of the Collateral, but only with the consent of the "Lender" (which is now Plaintiff Aiwa Holdings, LLC):

> Conditioned upon execution of the oath prescribed by law and payment of the bonds, **Receiver shall be authorized at Lender's direction and discretion**, subject to control of this Court, to do any and all acts necessary to the proper and lawful conduct of the receivership, including the following powers and duties:

(a)    **Seize, take charge and keep possession of the Collateral, including but not limited to management of the Collateral to the exclusion of Borrower, Borrower's representatives and third party**; Receive income from the Collateral;

\*       \*       \*

(g)    **With the consent of Lender, take any and all actions necessary to use, convert, process and market the Collateral** or the resulting products or services for the highest and best value, including, but not limited to sale of the Collateral by auction and/or assisting Lender with disposition of the Collateral;

Receivership Order pp. 2-3 (emphasis added). Importantly, the Receivership Order also enjoined Borrower or any of its agents from interfering in any way with the efforts of the Receiver:

IT IS FURTHER ORDERED that **Borrower, its members, its agents**, its general and limited partners, and any persons acting under Borrower's direction are (i) directed to deliver the Collateral to the Receiver upon request; (ii) **enjoined from in any way disturbing the possession of the Collateral or other property that is the subject of this Order**; (iii) **prohibited and restrained from disposing of, dissipating, mishandling, or misappropriating the Collateral or other such property**; (iv) **prohibited from taking any actions that would, directly or indirectly, have an adverse impact on the value of the Collateral**;

Receivership Order pp. 4-5 (emphasis added). As if the above language was not clear enough, the Receivership Order further "ORDERED that all persons, firms, corporations, or other entities are hereby **enjoined from** proceeding to levy upon or from **otherwise interfering with the Receiver's possession of the above-described Collateral** until final judgment of this Court." Receivership Order p. 5 (emphasis added).

On May 27, 2021, Joe Born ("Born") of Aiwa Corporation emailed the Receiver claiming that Borrower allegedly had "sufficient funds to pay the debt for which you were appointed the Receiver to collect." Motion at Ex. C p. 42. As an initial matter, this was not and still is not true as discussed below. More importantly, the alleged source of these funds was a purported sale of assets to Aiwa Acquisitions LLC and Sakar International, Inc. (together, "Sakar"). However, as discussed

more fully below, the assets purportedly sold to Sakar were in the exclusive control and possession

of the Receiver and both Borrower and its president, Born, were expressly enjoined from in any way

disturbing or interfering with the Receiver's possession of the assets. Born then threatened the

Receiver that Borrower would seek his removal if he did not consent to the sale:

> Separately, attached is the Asset Purchase Agreement. **Given your
> role as Receiver you may sign it and we can pay off the debt. Or
> you may refuse and we will file a motion to remove you as
> Receiver** and deliver funds directly to Mizari. We will do whichever
> you prefer, but will be filing shortly one way or the other.

*Id.* (emphasis added). The Receiver then responded: "All of this is news to me. Why wait a week to

communicate this wealth of information." *Id.* Later that day, the Receiver (who was not represented

by counsel at the time) told Born and Borrower's attorney that he was "going back to the Court to

sort it out." Aiwa Corp. Motion at Ex. C p. 43.

The Receiver then emailed the court reporter seeking an audience with the Court in order to

seek guidance on how to move forward with his duties. The following day (May 28), the Court

scheduled a status conference in this case on June 3, 2021.

On May 28, 2021, Born sent another email to the Receiver in which he admits that he hid

the Sakar transaction from the Receiver, and that he did so on advice of counsel:

> **I did not inform you of the Sakar offer previously** for a few
> simple reasons. First, it wasn't clear it was real[1] and Mizari made very
> clear they had no additional money to put in (although that changed
> suddenly last week after they heard of the offer). Second, I assumed
> once they knew about another offer they would move to accelerate a
> foreclosure or who knows what. **The advice of counsel was not to
> inform them till we had a deal in hand**.

Motion at Ex. C p. 44.

---

[1] Interestingly, Born's statement (as to the Sakar "offer") that "it wasn't clear it was real….", expressly repudiates
Defendant's assertions that a deal was already consummated with Sakar and there was "cash set aside to pay the Notes
and related Receiver expenses in full." Motion at 3.

On June 2, 2021, Borrower followed through on its threat to seek removal of the Receiver and filed Defendant's Motion to Discharge the Receiver, with the sole basis being that Borrower had allegedly sold all of the assets subject to the Receivership Order. Notably, the filing stated, without limitation or caveat, that Borrower had "completed an asset sale." Def's Motion to Discharge Receiver, p. 2. Of course, Borrower had neither the right nor the ability to sell any of the assets because the assets were under the exclusive control of the Receiver and Borrower and Born had been enjoined from interfering with the Receiver's control of the assets. Based on this direct and unequivocal violation of the Receivership Order, the Borrower then asked the Court to reward Borrower by discharging the Receiver.

However, within hours of Borrower's filing of its Motion to Discharge Receiver, and with the scheduled status conference set the following morning, new counsel appeared for Borrower and promptly withdrew the motion.

The next morning, on June 3, 2021, Borrower's counsel, as well as Born, remotely participated in a status conference before the Court. In that status conference, counsel for the Receiver informed the Court that the Receiver was aware of two potential offers for the receivership assets. One purported offer came from Sakar through Born, while Plaintiff Aiwa Holdings, LLC communicated its offer in writing directly to the Receiver and followed it up with written documentation supporting its offer. The Receiver made clear that the offer from Plaintiff had more favorable economic terms and that he was inclined to approve the sale if he became comfortable with the legal terms. In response, Borrower's counsel simply stated that he had a productive conversation with the Receiver's counsel the day before, was aware of Sakar's purported offer and Plaintiff's actual offer and supported an expeditious sale of the receivership assets because Borrower was "hemorrhaging cash." Notably, he did not (1) disagree with anything said by Receiver's counsel, (2) advise the Court that Borrower had purportedly already consummated a deal with Sakar two

weeks earlier, (3) complain about any actions of the Receiver, (4) argue that the Receiver was not properly qualified, (5) assert that the Receiver was no longer needed, (6) demand a payoff statement from the Plaintiff, or (7) otherwise object in any way to the possible finalization of a sale with the Plaintiff. The Court then essentially told the parties that it sounded like everything was progressing appropriately and that she was available in the event any issues arose.

After the status conference, Plaintiff continued negotiating the legal terms of a sale with the Receiver, which was fully consistent with the information conveyed to the Court at the status conference. On June 7, 2021, Plaintiff and the Receiver reached an agreement on terms and executed an Asset Purchase Agreement ("Aiwa Holdings APA"), a copy of which is attached to Borrower's Motion, and consummated the sale with Plaintiff pursuant to the Aiwa Holdings APA and in accordance with the Receivership Order.

On June 8, 2021, the Receiver confirmed receipt of the funds from Plaintiff, affirmed the closing of the sale of the receivership assets to the Plaintiff as of June 7, 2021, and promptly notified the Court and all parties of the sale by filing a status report. The closing of this sale was absolutely consistent with the Receiver's statements at the June 3 status conference and could have come as no surprise to anyone who participated in the status conference.

Importantly, at the time the Receiver closed the sale with Plaintiff, the Receiver had not received *any* of the following:

1. A signed written offer from any purchaser other than Plaintiff;

2. Any other purchase agreement in form and substance satisfactory to the Receiver in his sole and exclusive discretion;  or

3. Funds deposited by any other party in good faith toward a contemplated transaction or an amount sufficient to satisfy the amount of Plaintiff's secured claim.

Other than the offer from Plaintiff, the Receiver had only been provided with an unsigned, undated draft purchase agreement between Sakar and Borrower for a deal that Born admitted he had hidden from the Receiver and that he himself acknowledged in writing may not be "real." Motion at Ex. C, p. 44.

Two days later (June 10), Borrower reversed course again and filed its Motion, which is essentially a more substantial version of its previously withdrawn filing. Notably, the positions taken in the Motion bear no resemblance whatsoever to the position taken by Borrower at the status conference. Moreover, the Motion is based on inapplicable case law and ignores the language of the Receivership Order. Borrower *agreed* to this order, yet seeks to benefit from violating it. Ironically, Plaintiff had no involvement in the drafting of the order, as it was prepared by the prior lender. Further, and perhaps most curiously, the Motion appears to ask the Court to set aside the sale of the assets in favor of an alleged deal with Sakar that provides $1 million less in consideration for the assets and fails to provide a meaningful solution as to how to collect and remit to Defendant's creditors the proceeds to be paid in connection with the sale, given the likelihood that Defendant may very well dissolve given its present financial and operational circumstances.

As described more fully below, there is simply no basis for setting aside the sale of the receivership assets or discharging the receiver in this case.

### III.
### ARGUMENT AND AUTHORITIES

### A.  Borrower Ignores the Facts and the Receivership Order

Borrower takes several curious positions in its Motion. For example, it states that it "informed the Receiver that it did not want to sell its assets to Mizari [which refers to Plaintiff] and intended to consummate the Sakar Transaction." Motion at 4. However, one of the purposes of a receivership is to remove control of the assets from the borrower and to deprive the borrower of the ability to dissipate, sell and/or transfer the assets. This concept appears to be lost on Borrower.

Borrower also suggests that "the Receiver ignored the Company's desires…" and failed to "seek[] input on the proposed transaction from the Company." Motion at 4. Of course, nothing in the Receivership Order or the law requires the Receiver to consider, much less follow, the "desires" of the defaulted borrower or seek its input.

Borrower then suggests that the Receiver negotiated the Aiwa Holdings APA "in secret." Motion at 4. This is patently false, as the proposed sale was discussed in open court at the June 3 status conference and also discussed between Receiver's counsel and Borrower's counsel.

Borrower also suggests that the Receiver entered into the Aiwa Holdings APA "without seeking authorization or guidance from the Court." Motion at 4. Once again, this is simply not true. The June 3 status conference was a direct result of the Receiver reaching out to the Court on his own, prior to retaining counsel, for guidance. During the status conference, the Receiver's counsel explained to the Court exactly what the Receiver was doing and what he intended to do. The Court expressed its approval of the Receiver's actions and plans for moving forward.

Borrower also suggests that the Receiver should have conditioned the sale on Court approval. Motion at 4. Yet the unsigned, undated draft version of the Sakar APA provided to the Receiver by Borrower contained no such condition even though Borrower had no right to sell the assets at all and was, in fact, enjoined from attempting to do so. Further, there is no such requirement contained in the Receivership Order.

## B. The Receivership Order Has Never Been Modified and is Controlling

The Receiver has acted consistently with the *agreed* Receivership Order. Borrower simply has no right to back out of the order to which it previously agreed, much less simply ignore its existence and attempt to do things that are expressly prohibited by the order. *See Int. of C.S.B.*, No. 05-19-00627-CV, 2020 WL 2715188, at *6 (Tex. App.—Dallas, May 26, 2020, no pet.) ("The parties' express agreement to this provision in the Amended Receivership Order thus justified

reimbursement for the Willow Bend Loans as provided by the Disbursement Order, and waived wife's objection to the reimbursement"); *see also First Heights Bank, FSB v. Marom*, 934 S.W.2d 843, 845 (Tex.App.–Houston [14th Dist.] 1996, no writ) ("[O]nce the trial court renders an agreed judgment, a party may not withdraw its consent if at the time of rendition the trial court was not aware of any objection."). Borrower is precluded from its attempts to undo the Receiver's authority. *Brandon v. Wells Fargo Bank, N.A. as Tr. for Registered Holders of LaSalle Com. Mortg. Sec., Inc. 2007-MF5*, No. 13-18-00393-CV, 2020 WL 2776714, at *11 (Tex. App.—Corpus Christi-Edinburgh, May 28, 2020, no pet.) (citing *I-10 Colony, Inc. v. Lee*, No. 01-14-00465-CV, 2015 WL 1869467, at *4 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, no pet.) (mem. op.)) (concluding that a party waived its complaint regarding the appointment of a receiver and the scope of the receiver's authority when the receiver's appointment was by agreement, and overruling issue on appeal); *I-10 Colony, Inc. v. Lee*, No. 01-14-00465-CV, 2015 WL 1869467, at *4 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, no pet.) ("We conclude that I–10 has waived its complaints, including its constitutional complaints, regarding the appointment of a receiver and the scope of the receiver's authority by requesting the appointment and agreeing to confer upon the receiver the authority about which it now complains."); *see generally Barton v. Sclafani Invs., Inc.*, 320 S.W.3d 453, 458 (Tex. App.—Dallas 2010, pet. denied) (summarily dismissing appellate issue because appellant waived his complaint by signing an order agreeing to the relief complained of on appeal); *Young v. Young*, 854 S.W.2d 698, 701 (Tex. App.—Dallas 1993, writ denied) (unless varied by statute, "the parties are bound by the language in the agreed order" after entering into agreed order for appointment of master in chancery).

Further, even if Borrower could have obtained a modification of the *agreed* order, it never requested one. On the contrary, it actually filed a motion to *enforce* the order. The Receivership Order has never been modified, remains in place and is controlling in this case.

The Receivership Order governs the scope of the Receiver's authority and did not mandate any specific actions or requirements for the Receiver to close the Aiwa Holdings APA. On the contrary, the Order gave the Receiver wide latitude by providing that the "Receiver shall be authorized at Lender's direction and discretion, subject to control of this Court, to … (g) **With the consent of Lender, take any and all actions necessary to use, convert, process and market the Collateral or the resulting products or services for the highest and best value, including, but not limited to sale of the Collateral by auction and/or assisting Lender with disposition of the Collateral**." (emphasis added). This is precisely what the Receiver did in this case.

Borrower also falsely claims that the Aiwa Holdings APA "purports to bind the Company to perform certain obligations after closing, which the Receiver has no authority to do." Motion at 5. However, the provision of the Aiwa Holdings APA providing that the Borrower will provide the Receiver with a creditor's list is fully consistent with the provision of the Receivership Order allowing the Receiver to "Obtain from Borrower information concerning the Collateral, including without limitation … complete and accurate books of account and records adequate to reflect correctly the operations of the business and Collateral information." Receivership Order at 3. Further, the provisions of the Aiwa Holdings APA regarding the selection of the "Creditors Representative" *includes* Borrower in the process by initially seeking a mutual agreement between Borrower and Plaintiff. Motion Ex. D § 2.3(b)(iii). The Creditors Representative concept provides protection to the Borrower's other creditors by ensuring that the future payments are used to pay creditors rather than being misappropriated.[2] Given Borrower's prior expression of concern that the Receiver not take any actions "to the detriment of AIWA's creditors and [that] only benefits the ultimate purchaser of the Collateral," its concerns about the Creditors Representative are misplaced.

---

[2] This is an existential issue. Plaintiff has reason to believe that Born has engaged in actions regarding inventory that either violated the Receivership Order or attempted to circumvent it, failed to respond to a direct request for an accounting by the Receiver, and also violated his fiduciary obligations to Borrower.

### C.  Borrower's Reliance on Cited Legal Authorities is Misplaced

Borrower would have this Court believe that the Receiver was obligated to take several additional steps prior to the sale of the assets despite the broad powers granted to him under the Receivership Order. But Borrower's Motion is predicated upon distinguishable Texas authority, none of which involved an agreed receivership order, and each can be distinguished based on the express language of the receivership order governing the powers and requirements of the receiver as to the handling of receivership property in each respective case and/or the context in which the receivership arose:

- *Harrington v. Schuble*, 608 S.W.2d 253 (Tex. App.—Houston [14th Dist.] 1980, no writ) – Borrower's block quote outlining a purported list of steps for a sale by a receiver from *Harrington* conveniently begins right after a sentence that says, "In receivership proceedings *regarding the sale of a homestead*, certain steps should be followed." *Id.* at 256. *Harrington* has no applicability in this case.

- *Sims v. Thomas*, 584 S.W.3d 880 (Tex.App. – Dallas 2019, no pet.) – The judgment appointing the receiver specifically stated, "If Defendant Sims does not exercise her right to negotiate a price agreeable to the other parties, the Receiver must file a Motion with the court to approve the final sale. Any Receiver sale is a judicial sale and must be authorized and confirmed by the court before title will transfer." A true and correct copy of said judgment is attached hereto as Exhibit A. Further, the Sims case involves the sale of residential and/or homestead property and relies on *Harrington*. Defendant has not pointed to any cases outside of this context (or even beyond *Harrington* and *Sims*) that require advance approval of a sale by a receiver.

- *Baumgarten v. Frost*, 186 S.W.2d 982 (Tex. 1945) – First, the receivership order in *Frost* states, "It is ordered and decreed by the court that Thomas M. Simpson be appointed … receiver herein, … and, **if need be under the direction of the court**, to sell, transfer and convey the whole or any part of the property of said railroad company." (emphasis added) In other words, there was no present grant of authority to the receiver to sell property in that case. Second, the receivership order in that case expressly "required a report to the court of the sale by the receiver and contemplated, if the terms of the sale as reported were satisfactory to the court, an order of approval". No such requirements are contained in the Receivership Order. Third, at most, *Frost* suggests that a receiver must submit a sale to the Court for confirmation after the sale, not a request for approval before the sale.

- *Scheel v. Alfaro*, 406 S.W.3d 216 (Tex.App. – San Antonio 2013, pet. denied) – There is no suggestion in this case that a receiver has to seek advanced approval of the terms of a sale. Instead, it says that the "sale of property by a receiver is generally

not effective until the sale is reported by the receiver and confirmed by the court, after notice to the parties." *Id.* at 222. The Receiver in the case at bar promptly reported the sale to the Court and the parties by filing a status report. To the extent any formal confirmation of the Court is required, Plaintiff anticipates the Receiver will seek such approval and it should be granted for reasons further outlined herein.

The case of *Salaymeh v. Plaza Centro, LLC*, 258 S.W.3d 236 (Tex.App. – Houston [1st Dist.] 2008, no pet.), which Plaintiff does not cite even though it is cited in the *Scheel* case, is far more on point. In that case, the receiver sold property for $150,000. Mohammed Salaymeh ("Mohammed") claimed a beneficial ownership in the property. Mohammed argued that the sale of the property was not lawful because, among other things, the trial court had not confirmed the sale. In response, the receiver filed a motion to confirm the sale, which was granted. Like Borrower in this case, Mohammed argued that the court erred in confirming the sale because proper procedures were not followed:

> Specifically, Mohammed contends that the trial court erred by (1) confirming the sale after rather than before the Receiver had sold the Property, (2) confirming the sale even though it did not receive notice from the Receiver of the specific terms of the sale until after the Receiver had sold the Property, and (3) failing to expressly authorize the disbursement of the proceeds of the sale by written order.

*Id.* at 242. The court disagreed:

> **None of the procedures asserted by Mohammed is required by statute, nor has any Texas court ever held that equity compels a court to follow all of these procedures in every case before an appellate court may affirm a trial court's confirmation of sale.** As discussed, the trial court acted within its discretion in concluding that the price paid for the Property was fair and reasonable and that Mohammed knew or reasonably should have known about the sale. Texas courts have long held under these circumstances that confirmation of a sale by the trial court cures all defects, mistakes, errors, and irregularities in the proceedings where the court had jurisdiction and where the sale is not subject to collateral attack.

*Id.* (citations omitted)(emphasis added).

### D.  The Receiver Disclosed the Potential Sale to Plaintiff at the June 3 Status Conference

Further, Borrower completely ignores the fact that the proposed sale to Plaintiff was, in fact, disclosed to both the Court and the parties in this case despite no requirement in the Receivership Order to do so. As described above, the Receiver informed the Court of the two competing potential offers and that he was prepared to accept the offer with superior economic terms (from Plaintiff) once legal terms had been agreed upon. Not only did Borrower not raise any objection, its counsel emphasized to this Court at the status conference that Borrower's primary concern was closing a deal as quickly as possible. In addition, Plaintiff understands that the Receiver's counsel actually outlined the financial terms of the deal to Borrower's counsel prior to the status conference. If Borrower had any issues, they should have been raised at the status conference.

### E.  Borrower Has Neither Alleged Nor Proven Legitimate Grounds to Set Aside the Sale

Borrower also ignores the actual standards for setting aside or refusing to confirm a receiver's sale. "Confirmation of a receiver's sale is a matter for the trial court's discretion depending on the particular facts of each case, and we will reverse this decision only upon a showing that the trial court has abused its discretion. A receiver's sale should not be set aside based on the sales price being inadequate unless there is a showing of fraud or material irregularities, or a showing that the inadequacy of the price received is so great as to shock the conscience of the court." *Scheel v. Alfaro*, 406 S.W.3d 216, 222 (Tex. App.—San Antonio 2013, pet. denied).

Critically, Borrower has not argued that the sales price obtained by the Receiver was inadequate in any way, nor could it. Instead, Borrower oddly claims that the Receiver should have acquiesced to Borrower's improper alleged sale to Sakar that would have generated *$1 million _less_ in consideration* than the sale by the Receiver. The oddity of this position is highlighted by Born's statement in an email to the Receiver that Plaintiff's "money remains as green as anyone's." Borrower's Motion at Ex. C, p. 44. Apparently, Born now has a different view but has provided no

basis for it. Perhaps there are undisclosed personal compensation for Born as part of the purported

Sakar transaction. No other explanation seems apparent for Born's decision to breach his fiduciary

obligations to Borrower and its creditors by arguing for a purported deal that pays *less* money for the

*same* assets.

The superior financial terms in the Aiwa Holdings APA further demonstrate that the

Receiver properly exercised his discretion and complied with the Receivership Order. A comparison

of the two deals clearly reveals the superiority of the Aiwa Holdings APA:

|  | Receiver Executed Deal with Aiwa Holdings, LLC | Company negotiated deal with Sakar in violation of Receivership Order |
|---|---|---|
| Cash Consideration | $     4,750,000.00 | $     4,500,000.00 |
| Promissory Payments | $     2,250,000.00 | $     1,500,000.00 |
| **Total Consideration** | **$     7,000,000.00** | **$     6,000,000.00** |

In addition, the representations and warranties in the Aiwa Holdings APA were significantly limited,

reflecting an "As Is, Where Is" sale. As a result, there is a substantially better chance that the

Holdback Amount will be paid in full within 120 days following the closing. Also, the Aiwa

Holdings APA does not require the Borrower to indemnify the buyer for any losses or damages. In

contrast, the draft Sakar agreement included indemnity obligations up to a cap of $1.2 million. The

Aiwa Holdings APA also includes a separate guaranty of the Performance Payments in an amount

equal to the Performance Cap set forth in the Sakar draft agreement. Finally, based on prior

representations by Born to Plaintiff in late April, the purchase price in the Aiwa Holdings APA will

likely satisfy all or substantially all of Borrower's creditor's claims in full. In sum, the Aiwa Holdings

APA was superior to the alleged Sakar deal by any metric.

Borrower also ignores the language in the Receivership Order charging the Receiver to

"preserve and maximize the value of the Collateral." Receivership Order, p. 3. Borrower's position is

odd considering its prior Motion to Enforce Order Appointing Receiver that was expressly based on

the need to maximize the value of the Collateral. The Receiver took the best deal that had been presented to him, as explained to the Court at the June 3 status conference, and promptly consummated the sale pursuant to the Receivership Order by June 7, 2021.

Given the Receiver's own knowledge of Borrower's deteriorating financial condition, as well as the comments by Borrower's counsel at the June 3 status conference that a quick sale was critical due to Borrower "hemorrhaging cash," any challenge of the Receiver's decision to close the sale with Plaintiff is absurd.

### F. Borrower's Purported Sale to Sakar is Void

To the extent the purported offer of Sakar is even relevant, and even assuming that Sakar had properly deposited the requisite funds with the Receiver along with a binding written agreement duly signed by Sakar evidencing its interest in purchasing the Collateral from Borrower in consideration of said funds, it is void as a matter of law. Once the Court entered the Receivership Order, the assets were in *custodia legis* and the Receiver held the assets to be administered pursuant to the terms of the Receivership Order. The order only contemplated a sale of the Assets under one of two scenarios. First, the Receiver himself could sell the assets, with the consent of the Lender, pursuant to subpart (g) of the Receivership Order. Second, the Lender could exercise any remedies relating to the Collateral under its loan documents, "including, but without limitation, conducting a UCC disposition or foreclosure sale." Receivership Order p. 4; *see also* p. 6 ("nothing herein shall interfere with, prohibit, or impede Lender from exercising its rights against the Collateral, including, but not limited to, proceeding with disposition or foreclosure of the Collateral"). The *agreed* Receivership Order, by its express terms, did not permit any sale by the Borrower.

Any purported sale outside the Receivership Order is void and unenforceable as a matter of law. "No one has the authority, even under a prior deed of trust or execution, to sell property held in custodia legis by a duly appointed receiver, unless the sale is authorized by the court in which the

receivership is pending." *First S. Properties, Inc. v. Vallone*, 533 S.W.2d 339, 341 (Tex. 1976). "Any sale or transfer of property in violation of this rule is void as a matter of law." *Pratt v. Amrex, Inc.*, 354 S.W.3d 502, 506 (Tex. App.—San Antonio 2011, pet. denied), citing *First S. Props., Inc. v. Vallone* at 342; *see also Hacker v. Hacker*, 4 S.W.2d 218, 221 (Tex. Civ. App.—Galveston 1928, no writ)("We agree with appellant that the sale under the trust deed was unauthorized and did not pass appellant's title to the defendant Schwiekart, because the property at the time of the sale was in custodia legis. The district court of Harris county having acquired jurisdiction over the property by the divorce proceeding, and having appointed a receiver to take charge of it and dispose of it in accordance with the decree of that court, no valid sale of the property could be made under process from any other court without the consent of the court in which the receivership was pending, and for a stronger reason a sale by a trustee foreclosing a lien would not affect the title held by the receiver.")

### G.  It is Unclear Whether the Sakar Deal is Even Real

Further, it is not even clear that a sale has been "completed" as alleged in Borrower's Motion. Borrower did not attach a copy of the purported Asset Purchase Agreement entered into with Sakar. To date, Plaintiff has only seen an unsigned, undated draft version of an agreement with Sakar. Thus, it is unclear whether any such agreement has actually been signed or, if it has, what terms are contained within the agreement. For example, is the sale actually conditioned upon the consent of the Receiver as alleged? Given Borrower's representation in a prior filing that a sale of the assets had been "completed," it seems unlikely that any consent of the Receiver really was required. Also, if a sale really was consummated, then why would Borrower need to enter into an exclusivity agreement with Sakar? Of course, the purported Exclusivity and Support Agreement attached as Exhibit C to the Motion is neither dated nor signed. In addition, the last sentence of section 1 of the document, which relates to "any transaction which is affected by the Receiver or otherwise mandated by a court" simply trails off after the words "shall not," with no actual end to

the sentence.

Borrower also states that "Sakar signed the necessary agreements and placed them in escrow along with $4.2 million in cash – more than enough to pay the Notes in full along with the receiver's fees and expenses." Motion at 2. Even if Borrower's purported evidence to support this statement is accepted, it merely shows that $4.2 million is being held in escrow by the buyer's counsel and has not actually changed hands and very well may, at the direction of Sakar, be returned to Sakar at any time. There is simply no evidence that Borrower actually possesses the funds necessary to pay off its debt to Plaintiff. Further, there is no evidence as to how much money, if any, would be paid to Plaintiff and under what conditions. Borrower's statements and purported evidence raise far more questions than answers. Of course, even if Borrower did have or have access to the money, it is only in connection with a purported sale of assets that is void as a matter of law because of the Receivership Order.

### H.  Borrower Has No Explanation for Its Violation of the Receivership Order

Borrower does not even attempt to provide an explanation for its blatant violation of this Court's Receivership Order. To the extent Borrower now asks the Court to essentially ratify its wrongful conduct in attempting to circumvent the order, the Court should reject such a request. Borrower's lack of good faith is underscored by its previous argument to the Court that the Receiver somehow violated the order by merely *postponing* a scheduled sale of the assets involving multiple potential bidders. *See* Plaintiff's Motion to Enforce Order Appointing Receiver, p. 2. Now, Borrower attempts to circumvent entirely the Receiver's efforts to market and sell the assets in favor of a sale negotiated by Borrower in violation of the Receivership Order (and admittedly hidden from the Receiver) and without the consent of either the Receiver or the Lender. Not only does Borrower provide no explanation for its violation of the Receivership Order, it asks the Court to set the Aiwa Holdings APA aside in favor of a lesser deal that was negotiated in blatant violation of the order.

### I.   Borrower Has No Right of Redemption

Even if Texas Business & Commerce Code § 9-623 is applicable in light of the terms of the agreed Receivership Order (which Plaintiff does not concede), Borrower does not have the funds to pay Plaintiff and/or has never tendered such funds to Plaintiff. To the extent Borrower may even have potential access to such funds, it is the result of a void and unenforceable sale to Sakar in violation of the Receivership Order. Finally, it is too late to exercise any right of redemption now that the receivership assets have been sold.

### J.   Borrower Has Not Established Any Basis for Discharging the Receiver

As described above, the entire basis for the Borrower's argument that the Court should discharge the Receiver rests on its purported deal with Sakar in violation of the Receivership Order. Such an agreement (if it truly exists) is unenforceable as a matter of law. Further, Borrower does not have the money to pay the debt owed to Plaintiff. At best, the money may be in the account of Sakar's counsel. Borrower also fails to acknowledge that the Receiver was appointed pursuant to an *agreed order* and that Borrower cannot simply back out of the agreement, particularly when the sale to Plaintiff has closed.

Borrower also claims that the statement in the Receivership Order that Mr. Garbani was not "related to any party to this action" is false. In support, it points to his statement in an email that he was a "friend" of the principal of the Original Lender. Being a "friend" does not constitute being "related to any party." Further, to the extent it is even relevant, Borrower presumably had direct involvement in the drafting of the Receivership Order and the selection of Mr. Garbani as Receiver, and expressly approved both when agreeing to the order. On the contrary, Plaintiff has no relationship with Mr. Garbani outside of this case and no involvement in crafting the Receivership Order.

While the Receiver has consummated a deal with Plaintiff in compliance with the

Receivership Order, certain tasks remain as the Receivership Order also contemplates more than merely selling the assets and paying Plaintiff. The Receiver must also be paid and any remaining assets or business under the control of the receiver (including any bank accounts) must be wound down or transitioned. The Receiver also has various post-closing obligations under the Aiwa Holdings APA. The Receiver may also need to provide an inventory and/or accounting to the Court. Furthermore, Plaintiff, as the purchaser of the Collateral, in reliance on its acquisition, has begun to expend time and resources in the ownership and administration of these assets, and has advised the Receiver that it will need assistance from the Receiver in the turn-over and transition of the assets to Plaintiff as well as obtain the requisite information to commence payment to creditors of Borrower through the proceeds generated from the sale, subject to the selection and appointment of a creditors representative as contemplated in the Aiwa Holdings APA. Thus, there is no basis for discharging the Receiver. Instead, the Court should confirm that sale and allow the Receiver to complete his remaining obligations before closing out both this case and the receivership.

## IV.
### OBJECTIONS TO EVIDENCE

Plaintiff objects to the evidence submitted by Borrower in support of its Motion as follows:

- Declaration of Joseph Born – In paragraph 11, Born states that the facts in paragraphs 2 through 11 of the Motion are true and correct.

    o Motion ¶ 3 – Plaintiff objects to the statement that Mizari "embarked on an attempt to acquire the Company's assets to the exclusion of others" as vague, ambiguous, conclusory and lacking foundation.

    o Motion ¶ 5 – Plaintiff objects to the statement that various individuals or entities purportedly approved of the Sakar deal as lacking foundation and constituting hearsay.

    o Motion ¶ 6 – Plaintiff objects to the statement that there "were, and there are, no condition to the release of the escrowed funds and the agreements Sakar had executed other than the condition that the Company obtain a payoff amount on the Notes, lien releases in full on the Notes, and either consent of the receiver to the transaction or discharge of the receiver." Such

statements lack foundation. Further, they purport to relate terms of agreements purportedly entered into by and between Borrower and Sakar. Such documents would speak for themselves but Borrower has not provided them to the Court. Accordingly, the referenced statements are barred by the best evidence rule. *See* Tex. R. Evid. 1002.

o   Motion ¶ 7 – Plaintiff objects to the statements about the content or terms of the purported Exclusivity and Support Agreement as lacking foundation and violating the best evidence rule. Borrower has only provided what appears to be a draft copy of the purported agreement, which is neither signed nor dated.

o   Motion ¶ 9 – Plaintiff objects to the first sentence of this paragraph on the grounds that it lacks foundation, is speculative and constitutes an improper legal opinion regarding the purpose or need for the receivership. Plaintiff objects to the second sentence of this paragraph on the grounds that it lacks foundation and is speculative. Plaintiff objects to the third sentence in this paragraph on the grounds that it lacks foundation, is speculative and constitutes an improper legal opinion regarding any right of redemption. Plaintiff further objects to the paragraph in its entirety under the best evidence rule to the extent it seeks to describe the terms of purported agreements that are not before the Court.

o   Motion ¶ 10 – Plaintiff objects to the statement that the Receiver "thwarted the Company's right and refused to consent to the transaction or even provide a payoff amount." Such statement lacks foundation and constitutes an improper legal opinion regarding Borrower's purported right and the Receiver's responsibilities. Plaintiff further objects to the statement that the "Receiver has openly acknowledged that he is nothing more than a puppet for Mizari." Such statement is argumentative, lacks foundation and is not supported by the text of the email referenced in support of the statement. Plaintiff further objects to the last sentence of the paragraph regarding what Plaintiff may or may not have consented to or allowed as lacking foundation and constituting speculation. It also ignores the terms of the agreed Receivership Order.

o   Motion ¶ 11 – Plaintiff objects to the statement that Borrower enter into an exclusivity agreement because it lacks foundation and violates the best evidence rule since a signed copy of the purported agreement is not before the Court. Plaintiff further objects to the statement that the "Receiver ignored the Company's desires" as lacking foundation and constituting an improper legal opinion. Plaintiff further objects to the statements that the Receiver "hurriedly determined to enter into a purportedly binding agreement to sell the Company" and negotiated "in secret" on the grounds that the statements are speculative and lacks foundation. Further, the suggestion that the Receiver could or did sell "the Company" rather than the receivership assets is patently false. In addition, the Receiver disclosed the status of negotiations with the Plaintiff at the June 3 status conference.

- Exhibit B (Exclusivity and Support Agreement) – Plaintiff objects to this documents under the best evidence rule and/or because the copy provided is not signed.

- Declaration of Morris Missry – Plaintiff objects to the statements in paragraph 3 of the declaration to the extent they seek to describe the terms of agreements that have either not been provided to the Court at all (the purported Sakar APA) or only an unsigned copy has been provided (the purported exclusivity agreement) based on lack of foundation and the best evidence rule.

## V.
### CONCLUSION

For the foregoing reasons, Plaintiff Aiwa Holdings, LLC requests that the Court deny Borrower's Motion and grant all other and further relief to which Plaintiff Aiwa Holdings, LLC is entitled.

Respectfully submitted,

**KANE RUSSELL COLEMAN LOGAN PC**


By:  */s/ Brian W. Clark*
        Brian W. Clark
        State Bar No. 24032075
        bclark@krcl.com

901 Main Street
Suite 5200
Dallas, TX 75202
Telephone:      (214) 777-4200
Facsimile:      (214) 777-4299

**ATTORNEYS FOR AIWA HOLDINGS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing document was served on all

counsel of record via E-Service this 18th day of June, 2021.

/s/ Brian W. Clark
Brian W. Clark

NO. <u>DC-16-16409</u>

| | | |
|---|---|---|
| TINA THOMAS<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| V. | §<br>§ | 160TH JUDICIAL DISTRICT |
| SIMONE JOHNSON AND SANDRA<br>LYNN SIMS<br>Defendant. | §<br>§<br>§ | OF DALLAS COUNTY, TEXAS |

JUDGMENT

A trial of this cause was held on July 31, 2017. All parties appeared and announced to the court that they were ready for trial. A jury was not requested, and the court decided all fact questions.

The court considered the pleadings and official records on file in this cause, the evidence, and the parties' arguments, and grants judgment as follows:

1.    Plaintiff and Defendants are co-tenants and the sole owners of the real property located in Dallas County, Texas, and described as follows: Lot Three (3) in Block D/6852 of Arden Terrace, An Addition to the City of Dallas, Dallas County, Texas, according to the Map thereof recorded in Volume 34, Page 143, Map Records, Dallas County, Texas ('the Property").

2.    The Plaintiff is granted partition and apportionment of the jointly-owned Property in the following shares:

> Simone Johnson is granted a one-third interest in the Property.

> Tina Thomas is granted a one-third interest in the Property.

> Sandra Lynn Sims is granted a one-third interest in the Property and reimbursement for $2,500 of improvements on the Property.

3.    The Property is not susceptible to partition in kind.

THEREFORE, The Defendant, Sandra Lynn Sims, shall have an exclusive right to negotiate a reasonable purchase price with Plaintiff, Tina Thomas, and Defendant, Simone Johnson, for the purchase of their interests within 30 days of the date of this Judgment. Should the

**EXHIBIT A**

parties fail to negotiate a reasonable price on or before 30 days from the date of this judgment, the following is the order of the court:

a.    The Property shall be sold for cash by private sale through a Receiver.

b.    Roselita Lucas, 1602 Skline Drive, Garland, Texas 75043, Ph. 214-232-4589, is Appointed Receiver to conduct the sale, subject to the approval of this court.
The parties are ordered to cooperate with the Receiver in preparing the Property for sale and assisting the Receiver in showing and selling the Property.

c.    That prior to the commencement of any receivership duties, Ms. Lucas shall file with this court an Oath, signed in the presence of a Notary Public and bearing the above style and case number, attesting that she is a citizen and qualified voter of Texas, is not a party, attorney, or other person interested in this action, will faithfully perform all duties of the receivership, and execute a good and sufficient bond.

d.    That upon filing the Oath or immediately thereafter, a bond shall be posted by the Receiver with the Dallas County Clerk in the amount of $500.00.

e.    That the Receivership shall not commence until the Oath is filed and the bond posted.

f.    That should the Receiver sell the Property, she shall be entitled to reimbursement of her reasonable and necessary costs incurred in listing and showing the Property, and a 6% commission of the negotiated sales price.

IT IS FURTHER ORDERED that the net proceeds of the sale, after the costs of the sale and the fee of the Receiver shall have been paid, be returned to the court to be partitioned in proportion to the parties' respective interests, as set forth in paragraph 2 of this Judgment.

Except upon order of the court or agreement of the parties and Receiver, no fee shall be due to the Receiver if the parties work out an agreement as to the subject property prior to the Receiver receiving any offers on the house.   The Receiver, however, shall be entitled to reimbursement

**EXHIBIT A**

from the parties for any out-of-pocket expenses incurred or paid by the Receiver related to efforts to sell the property.   Upon receipt by the Receiver of written notice signed by each of the parties of any such agreement among the parties, the Receivership shall terminate without further orders of the court.

If Defendant Sims does not exercise her right to negotiate a price agreeable to the other parties, the Receiver must file a Motion with the court to approve the final sale.   Any Receiver sale is a judicial sale and must be authorized and confirmed by the court before title will transfer.

Taxable costs of the suit are to be borne by the party incurring same.   This is a final appealable judgment.

SIGNED on   August _24_ ,2017.

JIM JORDAN, JUDGE 160TH DISTRICT COURT, DALLAS COUNTY, TEXAS

**EXHIBIT A**