# EXHIBIT 2

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**AIWA CORPORATION,**
**as Seller**


**and**

**AIWA ACQUISITIONS, LLC,**
**as Buyer**


**AUGUST __, 2021**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is entered into as of the ___ day of August 2021 (the "**Effective Date**"), by and between **AIWA CORPORATION**, a Delaware corporation ("**Seller**"), and **AIWA ACQUISITIONS, LLC**, a Delaware limited liability company ("**Buyer**").  Buyer and Seller are referred to collectively herein as the "**Parties**."

**WHEREA**S, Seller commenced a case (the "**Case**") under chapter 5 of title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (the "**Bankruptcy Code**") on June __, 2021 by filing a voluntary petition with the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**");

**WHEREAS,** the sale of assets of the Business are subject to the supervision and control of Seller subject to the approval of the Bankruptcy Court;

**WHEREAS,** Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller certain tangible and intangible assets necessary to operate the Business, all in the manner and subject to the terms and conditions set forth herein, and pursuant to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure.

**WHEREAS,** the parties hereto desire to consummate the Contemplated Transactions as promptly as practicable after the Bankruptcy Court enters a Final Order approving the Contemplated Transactions (the "**Sale Order**").

**NOW, THEREFORE,** in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows.

## ARTICLE I
### Definitions

As used in this Agreement or in any Schedule attached hereto, the following capitalized terms shall have the meanings set forth below:

"**Acquired Assets**" has the meaning set forth in Section 2.1.

"**Acquired Contracts**" means the contracts in which Seller is a party as set forth in **Schedule 1**.

"**Action**" means any inquiry, claim, legal or other action, suit, arbitration, investigation, opposition, challenge, cancellation or proceeding by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Person specified.  The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies and affairs of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**AIWA Logo**" means the logo shown below, and all variations thereof, including all color variations:



"**Amazon Account**" shall mean that certain Amazon Seller Central Seller Account doing business under the names "AIWA" Merchant ID A14M79FDBNCF7U, including all seller feedback, listings, product reviews, and all associated rights, agreements and services in connection therewith.

"**Ancillary Agreements**" means, collectively, the Assignment Agreement, the Trademark Assignment, the Copyright Assignment, the Bill of Sale, the Employment Agreement, the Seller Closing Certificate and the Buyer Closing Certificate.

"**Assignment Agreement**" means the Assignment Agreement entered into concurrently herewith and attached as **Exhibit A**.

"**Bill of Sale**" means the Bill of Sale entered into concurrently herewith and attached as **Exhibit B**.

"**Breakup Fee**" has the meaning set forth in Section 5.8(c).

"**Books and Records**" has the meaning set forth in Section 2.1(f).

"**Business**" means, collectively, the business conducted up to and on the date hereof by Seller including, but not limited to, the business of designing, manufacturing, sourcing, importing, wholesaling, retailing, licensing, marketing, promoting, managing, selling and distributing goods and services, under the "Aiwa" brand name or otherwise.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which national banking institutions in New York, New York are closed as authorized or required by Law.

"**Buyer**" has the meaning set forth in the preface above, and includes its authorized successors and assigns.

"**B.V.**" means Aiwa Europe B.V.

"**B.V. License**" means the Trademark (Sub-) License Agreement between Seller and B.V. as of November 1, 2020.

"**Claim**" means any and all manner of actions, causes of actions, claims, debts, obligations, demands, Liabilities, damages, costs, losses, expenses (including attorneys' and other professional fees and expenses), compensation or other relief, whether known or unknown, matured or unmatured, contingent or otherwise, whether in law or equity.

"**Closing**" has the meaning set forth in Section 9.1.

"**Closing Date**" has the meaning set forth in Section 9.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company Valuation**" means (i) in the event of sale of all or substantially all of the Acquired Assets (including through a sale of the stock of the Buyer or merger), the total consideration paid by the purchaser in such acquisition transaction based on a sale of the entirety of the Acquired Assets (by way of example, if such purchaser purchases less than 100% of the Acquired Assets (or stock of the Buyer), then the value shall be based on the extrapolated value assuming such purchaser purchased 100% of the Acquired Assets) and (ii) in the event no sale of the Acquired Assets has occurred, then the equity value of the Buyer, as determined by an independent valuation firm retained by the Buyer for the purposes of determining the fair market value of the Buyer as of the fourth anniversary of the Closing Date.

"**Confidential Information**" has the meaning set forth in Section 5.3.

"**Contemplated Transactions**" means the purchase and sale of the Acquired Assets and all other transactions contemplated by the Agreement.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Copyright Assignment**" means the Copyright Assignment substantially in the form attached hereto as **Exhibit D**.

"**Copyrights**" means all published and unpublished works of authorship, whether copyrightable or not, including, without limitation, (a) all databases, data collections, and other compilations of information (including without limitation customer lists and customer databases), (b) the content and "look-and-feel" of all web pages, (c) all promotional, advertising, and marketing materials and the content thereof, including without limitation video footage, photography and artwork, (d) all copyrights in and to the foregoing, and applications, registrations, and renewals thereof, and (e) all moral rights or similar rights in and to the foregoing.

"**Creditors' List**" has the meaning set forth in Section 3.5.

"**Distribution Agreements**" means, collectively, the distribution agreements between (a) Ltd and JME SA, and (b) Ltd and Media Electronics SL.

"**Domain Name**" means domain names and resource locators and social media account names and handles (including Seller's Amazon accounts), whether or not trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights.

"**Effective Date**" has the meaning set forth in the initial paragraph above.

"**Employment Agreement**" means the employment agreements, each in a form reasonably acceptable to Buyer, duly executed by certain individuals to be determined by Buyer prior to Closing and attached hereto as **Exhibit I**.

"**Final Order**" means an order or judgment of the Bankruptcy Court as entered on the Docket that has not been reversed, stayed, modified, or amended, and respecting which the time to appeal, petition for certiorari or seek reargument, review or rehearing has expired, and to which no appeal, reargument, petition for certiorari, review or rehearing is pending, or as to which any right to appeal, reargue, petition for certiorari or seek review or rehearing has been waived in writing in a manner satisfactory to the Purchaser, or, if any appeal, reargument, petition for certiorari, review or rehearing thereof has been denied, the time to take further appeal or to seek certiorari or further rehearing, review or reargument has expired.

"**GAAP**" means U.S. generally accepted accounting principles applied on an accrual basis.

"**Governmental Authority**" means any United States or non-United States national, federal, state or local government, regulatory or administrative authority, agency or commission, multinational organization or authority, or any judicial or arbitral body.

"**Indebtedness Payoff Amount**" means the amount of all outstanding indebtedness owed by Seller in connection with the Lender Secured Claim as of the Closing, as reflected in payoff letters in respect thereof delivered to Buyer at the Closing.

"**Intellectual Property**" means all intellectual property, in any jurisdiction worldwide, whether registered and unregistered, including, without limitation: (a) all Patents, (b) all Marks, (c) all Copyrights, (d) all mask works and all applications, product samples, designs, molds, registrations, and renewals in connection therewith, (e) all published work and unpublished works of authorship, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, fabric patterns, drawings, specifications, schematics, business methods, prototypes, models, and trade secrets, (f) all technology and intellectual property, regardless of form, including, by way of illustration and not of limitation, all inventions and discoveries, computer and electronic data processing programs and software programs and related documentation, existing research projects, computer software presently under development, compilations, databases, derivative works, literary works, mask works, and sound recordings, and all software concepts owned and all proprietary information, processes, formulae and algorithms, used in the ownership, marketing, development, maintenance, support and delivery of such software, subject to all applicable licenses and rights to use such software, (g) rights of privacy and publicity and all other proprietary rights, (h) all copies and tangible embodiments thereof (in whatever form or medium), (i) all Domain Names, (j) the right to sue for and recover damages, assert, settle and/or release any claims or demands and obtain all other remedies and relief at law or equity for any past, present or future infringement or misappropriation of any of the foregoing and (k) all licenses, options to license and other contractual rights to use and enforce the foregoing.

"**Intellectual Property Assets**" has the meaning set forth in Section 2.1(b).

"**Intellectual Property Rights**" means all rights in, arising from, or associated with Intellectual Property in any jurisdiction, including without limitation: (a) rights in, arising from, or associated with Works of Authorship, including without limitation rights in mask works and databases and rights granted in connection with Copyrights and/or under the Copyright Act; (b) rights in, arising from, or associated with Inventions, including without limitation rights granted under the Patent Act; (c) rights in, arising from, or associated with the Marks, including without limitation all related goodwill and the rights granted under the Lanham Act; (d) rights in, arising from, or associated with Confidential Information, including without limitation rights granted under the Uniform Trade Secrets Act; (d) rights in, arising from, or associated with a person's name, voice, signature, photograph, or likeness included in the Acquired Assets, including without limitation rights of personality, privacy, and publicity; (e) rights of attribution and integrity and other moral rights of an author included in the Acquired Assets;  (f) rights in, arising from, or associated with domain names included in the Acquired Assets; (g) all rights to obtain renewals, reissues, reexaminations, continuations, continuations-in-part, divisions or other extensions of legal protections pertaining for all of the foregoing, and (j) all actions and rights to sue at law or in equity for past, present or future infringement or other impairment of any of the foregoing, including the right to receive all proceeds and damages therefrom.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other contracts, whether written or oral, relating to any Intellectual Property that is used or held for use in the conduct of the Business as currently conducted or proposed to be conducted to which Seller is a party, beneficiary or otherwise bound.

"**Inventory**" has the meaning as set forth in Section 2.1(c).

"**Law**" means any statute, law, ordinance, regulation, rule, code, injunction, judgment, decree or order of any Governmental Authority, or any similar provision having the force and effect of law.

"**Lender Secured Claim**" means the first priority perfected Security Interest originally held by Fairlane Fund One, LP and Fairlane Fixed Income Fund LLC in Seller as of the Closing Date in an amount estimated to be $3,750,000.

"**Liability**" means any claim, liability or obligation (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential, and whether due or to become due), including any liability for Taxes.

"**Ltd**" means Aiwa Co., Ltd.

"**Ltd Registration**" means Ltd's Japanese Copyright Registration No. 38186 for the Aiwa Logo.

"**Marks**" means all trademarks, service marks, trade dress, words, names, devices, designs, and other designations and combinations of the preceding items, used to identify or distinguish a business, good, group, product or service or to indicate a form of certification, including, without limitation, logos, slogans, trade names, designs, artwork, symbols,

certification marks, collective marks, business symbols, brand names, products designs and product features, d/b/a's and corporate names and other indicia of origin, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill of the business associated therewith and symbolized thereby, and all applications, registrations, and renewals in connection therewith.

"**Parties**" has the meaning set forth in the preface above.

"**Patents**" means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice) and all improvements thereto, and (b) all patents (including utility and design patents), patent applications, and disclosures thereof, together with all provisional, utilities, reissuances, continuations, continuations-in-part, conversions, counterparts, revisions, extensions, and reexaminations thereof.

"**Patent Assignment**" means the Patent Assignment entered into concurrently herewith and attached as **Exhibit E**.

"**Payoff Amount**" has the meaning set forth in Section 2.3(a).

"**Person**" means an individual, a partnership, a corporation, a limited liability company or partnership, an association, a joint stock company, a trust, a joint venture or an unincorporated organization.

"**Purchase Price**" has the meaning set forth in Section 2.3.

"**Sale Motion**" shall mean the motion or motions of Seller, seeking approval and entry of the Sale Order.

"**Sale Order**" shall mean the order approving the Sale Motion under Section 9.2(c).

"**Security Interest**" means any mortgage, pledge, option, preemptive right, right of first refusal or first offer, proxy, levy, voting trusts or agreements, lien, charge, claim, license, or other security interest or encumbrance (including, without limitation, any encumbrances arising from any Liability for Taxes).

"**Seller**" has the meaning set forth in the preface above, and includes is successors and assigns.

"**Seller Intellectual Property**" means all of the rights, title and interests of Seller in and to the Intellectual Property included within the Acquired Assets, including without limitation the Intellectual Property listed on **Schedule 2**.

"**Settlement Agreement**" means that certain Settlement and Mutual Release Agreement dated as of June 15, 2020 between Aiwa Co., Ltd and Towada Audio Co. Ltd , as Plaintiffs, and Seller, Hale Devices, Inc., River West Brands LLC, Dormitus Brands LLC, Mark Thomann and Born.

"**Tangible Personal Property**" has the meaning set forth in Section 2.1(h).

"**Trademark Assignments**" means the Trademark Assignments substantially in the forms attached hereto as **Exhibit C**.

"**Transfer Taxes**" has the meaning as set forth in Section 2.5 below.

## ARTICLE II
## Basic Transaction

Section 2.1.    <u>Purchases and Sale at Closing</u>.  Upon the Closing, and subject to the terms and conditions of this Agreement, and pursuant to Sections 105 and 363 of the Bankruptcy Code, Seller will sell and Buyer will buy, free and clear of any Security Interest or Liabilities, for the consideration specified below, all of the following assets, properties and rights of Seller (the "**Acquired Assets**"):

(a)    all Intellectual Property Rights associated with Intellectual Property owned or licensed to Seller, including, without limitation, the Mark "Aiwa" and AIWA Logo; all Intellectual Property listed on **Schedule 2**, including without limitation Patent Nos. 9, 172,787 and 9,305,060, and all other Intellectual Property and intangible assets of any kind and description, wherever located, that are owned by and/or licensed to Seller and/or used in Seller's Business, including without limitation (i) all unregistered Marks (and all common law rights therein) and unregistered Copyrights, and (ii) all intellectual property rights and other rights to use and license all samples, press books, patterns, drawings, sketches, molds, artwork, video footage, printed materials, catalogs, promotional and advertising materials, historical archives, and all other intellectual property rights, brand materials and/or other tangible assets of Seller relating to or incorporating the Mark "Aiwa" or Seller's other Intellectual Property (the "**Intellectual Property Assets**");

(b)    all of Seller's rights with respect to the Acquired Contracts, including, without limitation, Intellectual Property Rights therein;

(c)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

(d)    the Amazon Account and all other vendor numbers and vendor accounts through which Seller has conducted the Business;

(e)    originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and the Intellectual Property Agreements ("**Books and Records**").  Seller shall be entitled to maintain a copy of its Books and Records for the purposes of its own administration and winding-up;

(f)      all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of Seller ("**Inventory**");

(g)      all, if any, marketing materials, training materials, office and reference manuals and similar items that relate to or were used in, or that have been under development for use in, the conduct of the Business; and

(h)      all goodwill associated with the foregoing.

Section 2.2.    <u>No Assumption of Liabilities</u>.  Notwithstanding anything contained in this Agreement to the contrary, Buyer shall not assume and shall have no obligation to pay, satisfy, perform, discharge or fulfill any Liabilities or obligations of Seller or any of its Affiliates (whether known or unknown, liquidated or unliquidated, contingent or fixed, presently in existence or arising hereafter and including any Liabilities for duties, responsibilities, commitments, expenses, Taxes, obligations or other Liabilities of any kind and nature).  All of Liabilities of Seller or in connection with the Acquired Assets shall remain the Liabilities and obligations of Seller and shall not be assumed by Buyer pursuant hereto (regardless of whether any such Liabilities or obligations are disclosed in this Agreement).  Without limiting the generality of the foregoing, Buyer shall not assume or be liable in any manner for any of the following, which shall remain Seller's exclusive Liability: (a) all Liabilities related to the Business, including without limitation all Liabilities relating to data privacy and security, infringement, false advertising and consumer protection claims, product safety and defect claims, debt, guarantees, insurance policies, and employee benefit plans; (b) all Liabilities for Taxes of Seller, including, without limitation, Taxes arising from or as a result of Seller's ownership and use of the Mark prior to Closing; (c) all Liabilities of Seller for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby; (d) all Liabilities in respect of any and all Actions, litigations, mediations, disputes, oppositions or other proceedings with respect to or involving the Acquired Assets; (e) all Liabilities relating to any agreement, contract, plan, undertaking, franchise concession, license, purchase order, sales order or other similar commitment, obligation, arrangement or understanding, whether written or oral, and whether or not it is related to the Acquired Assets and/or the Acquired Contracts; (f) all Liabilities relating to (i) any employee or other benefit plan or (ii) the employment or engagement by Seller or any of its Affiliates, or termination of employment or engagement by Seller or any of its Affiliates, of any employer or other service provider of the Business; (g) any successor or derivative liability; and (h) Seller's breach or default of any obligation under the Acquired Contracts, or any Liabilities relating to Acquired Contracts.

Section 2.3.    <u>Purchase Price</u>.

(a)      <u>Payment of Purchase Price</u>.  The purchase price for the Acquired Assets (the "**Purchase Price**") shall be $6,000,000 in cash and up to $1,500,000.00 in bonus payments (the "**Bonus Payment**"). The Purchase Price shall be paid as follows: (i) $6,000,000.00 in cash to be transferred by wire transfer to Seller at Closing (the "**Payoff Amount**"); plus (ii) Buyer shall pay a one-time Bonus Payment of $1,500,000.00 upon the earlier of (x) the sale of all or substantially all of the Acquired Assets by Buyer or (y) the fourth anniversary of the Closing Date, in each case provided that the Company Valuation exceeds $20,000,000.00.  Buyer shall deliver such proceeds as directed by the Sale Order.

(b)    Acknowledgement.  Seller hereby acknowledges and agrees that Seller's right to receive any potential Bonus Payment (A) is solely an unsecured contractual right and is not a security for purposes of any federal or state securities laws, (B) will not be represented by any form of certificate or instrument, (C) does not give Seller any rights common to holders of equity securities, such as distribution rights, voting rights, preemptive rights, or anti-dilution rights, (D) is not redeemable, (E) may not be sold, assigned, pledged, gifted, conveyed, transferred or otherwise disposed of, except by operation of law.

(c)    Operation of the Business.  Seller hereby acknowledges and agrees that, from and after the Closing Date, control of all key business decisions regarding the Business in connection with the Acquired Assets (including any and all decisions relating to the operation of such business, as well as pertaining to any acquisitions, dispositions, purchases or sales of assets and the timing thereof, capital expenditures and the timing thereof, opening new or closing existing programs, clinics, offices or other facilities, developing new businesses, service offerings and pricing, marketing and contracting, employee hiring and retention, and facilities management) shall be conducted entirely in accordance with the directions of Buyer in its sole discretion; provided, however, without limiting the generality of the foregoing, the Buyer shall not take any action with the specific intent of avoiding the Bonus Payment.

Section 2.4.    Allocation.  Within ninety (90) days after the Closing Date, Buyer shall deliver to Sellers' Representative for Sellers' Representative's review and comment a schedule prepared in good faith allocating the purchase price for Tax purposes (as may be adjusted pursuant to the terms of this Agreement) in accordance with Section 1060 of the Code and the regulations thereunder (the "**Allocation Schedule**").  Each of Buyer and Seller will file all Tax Returns (including, but not limited to, IRS Forms 8594) consistent with the Allocation Schedule established pursuant to the terms of this Section 2.4. Sellers' Representative, on the one hand, and Buyer, on the other hand, each agrees to provide the other as soon as reasonably practicable with any other information required to complete IRS Forms 8594. Neither Buyer nor Seller shall take any Tax position inconsistent with such Allocation Schedule except to the extent, if any, otherwise required by applicable law, and neither Buyer nor Seller shall agree to any proposed adjustment by any Governmental Authority based upon or arising from the Allocation Schedule without first giving the other prior written notice; provided, however, that nothing contained herein shall prevent Buyer or Seller from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising from the Allocation Schedule, and neither Buyer nor Seller shall be required to litigate before any court any proposed deficiency or adjustment by any governmental authority based upon or arising from such Allocation Schedule. The Allocation Schedule shall be revised in accordance with Section 1060 of the Code and the regulations thereunder to appropriately take into account any payments made under this Agreement.

Section 2.5.    Transfer Taxes.  Seller shall bear and be responsible for any and all sales, use, transfer, stamp, registration, conveyance, documentary, recording and similar taxes and fees, and any deficiency, interest, or penalty asserted with respect thereto (the "**Transfer Taxes**") arising from the sale or transfer of the Acquired Assets pursuant to this Agreement, and the Parties shall cooperate as to the filing of all necessary documentation with respect to such Transfer Taxes.  Without limiting the generality of the foregoing, in no case shall Buyer be responsible for any income or capital gains tax (or similar taxes, charges, or fees) arising from

the sale or transfer of the Acquired Assets or any tax, charge, or fee due or otherwise payable in connection with the Acquired Assets prior to the Closing.

Section 2.6.     Corporate Name.   For the avoidance of doubt, upon Closing, Seller will have no rights to use, and will cease all use of, the Acquired Assets.   Promptly after the Closing, Seller shall (and shall cause its applicable Affiliates to) execute and file all necessary documents to amend the company and corporate name, as applicable, of Seller or any of its Affiliates to remove all references to "Aiwa" or any other Mark or Copyright within the Acquired Assets, or any derivations thereof, and shall execute any other documents, certificates, or agreements Buyer deems reasonably necessary to avoid confusion regarding the relationship of Seller and its Affiliates to the Acquired Assets; provided, that, following the Closing, for a reasonable period of time, Seller may use references to "Aiwa" in correspondence and filings with any Governmental Authority for the purpose of advising such Governmental Authority of Seller's new name.   Without limiting the foregoing, Seller hereby covenants that Seller and its Affiliates will not at any time after the Closing use or procure or cause or permit the use of any Mark or Copyright identical to or confusingly similar with any of the Marks included within the Acquired Assets (including without limitation the "Aiwa" trademark and logo) or any deliberate variation involving a colorable imitation of such Marks or Copyright.   For clarity, the prohibited activities described in the preceding sentence include without limitation use on any website, as part of any corporate or trade name, as part of any Domain Name, and in connection with statements such as "formerly associated with AIWA" (other than as expressly allowed above for the purpose of advising Governmental Authorities and other third parties).   Seller shall within sixteen days of entering of Sale Order amend the caption of its bankruptcy case to reflect its new corporate name.

Section 2.7.     Non-Competition and Non-Solicitation.   Seller shall not engage in the business of selling consumer electronics anywhere in the United States for a period of three (3) years after the Closing.   Seller further agrees not to solicit any of its current or former (within the one-year period prior to Closing) employees to terminate any relationship they may have with Buyer at any time within three (3) years after Closing.

## ARTICLE III
## Representations and Warranties of Seller

Seller represents and warrants to Buyer that the statements contained in this Article III are correct and complete as of the Closing.

Section 3.1.     Organization of Seller.   Seller is an entity duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

Section 3.2.     Authorization of Transaction.   Subject only to Bankruptcy Court approval pursuant to the Sale Order, Seller has the requisite power and authority to execute and deliver this Agreement and/or each Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder.   The execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement to which it is a party have been duly authorized by all requisite corporate or limited liability company action on the part of Seller.   Assuming due authorization, execution and delivery by Buyer, this Agreement constitutes the valid and legally

binding obligation of Seller, enforceable against Seller in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights and remedies generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 3.3.    <u>Non-contravention</u>.  Neither the entry of the Sale Order, nor the execution and the delivery by Seller of this Agreement, nor the consummation by Seller of the transactions contemplated hereby (including the assignments and assumptions contemplated hereby), will (i) violate the organizational documents of Seller; (ii) violate any Law applicable to Seller or any of the Acquired Assets, or by which Seller or any of the Acquired Assets may be bound or affected; or (iii) result in any material breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, or give to others any rights of termination, acceleration or cancellation of or with respect to the Acquired Assets and/or the Acquired Contracts, except as otherwise permitted or authorized by the Bankruptcy Court in accordance with Section 363 or 365 of the Bankruptcy Code..

Section 3.4.    <u>Consents</u>.    Other than the consent of Bankruptcy Court, Seller is not required to file, seek, or obtain any notice, authorization, approval, order, permit, or consent of or with any Person or Governmental Authority in connection with the execution, delivery and performance by Seller of this Agreement or each of the Ancillary Agreements to which it is a party or the consummation by Seller of the transactions contemplated hereby or thereby or in order to prevent the termination of any right, privilege, license or qualification relating to the Acquired Assets.

Section 3.5.    <u>Creditors' List</u>.    Attached hereto as **<u>Schedule 3</u>** is a true, correct and complete schedule of all Persons holding a Claim against Seller (the "**Creditors' List**").    Seller does not have any Liabilities or obligations that are not set forth on the Creditors' List.

Section 3.6.    <u>Brokers' Fees</u>.    Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or any other Person with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

Section 3.7.    <u>Title to Assets; Sufficiency</u>.    Seller has good and marketable title in and to the Acquired Assets, in each case free and clear of all Security Interests and, at the Closing, Seller will sell to Buyer good and marketable title in or to, all of the Acquired Assets, free and clear of all Security Interests, other than the Lender's Secured Claim which shall be satisfied at Closing.  The Acquired Assets include, by way of illustration and not limitation, the "Aiwa" Mark, all Copyrights associated with "Aiwa", and all of Seller's Intellectual Property.  The Acquired Assets comprise all of the Intellectual Property rights necessary for Buyer to, and/or license other Persons to, make, use, market, and sell products and marketing materials under the "Aiwa" brand that are (i) identical in all respects with the products and marketing materials made, used, marketed, and sold under the Business prior to Closing and (ii) used in the same geographic territories as the Business prior to Closing. The Acquired Assets will enable Buyer to, and/or license other Persons to, operate a business following the Closing in the same manner as the Business operated by Seller prior to Closing, and to market, sell and exploit the Acquired

Assets worldwide and in every category except as otherwise expressly set forth in <u>Section 3.7</u> of the Disclosure Schedule.

Section 3.8.    <u>Intellectual Property</u>.

(a)    The Intellectual Property constitutes all of the registered Patents, registered Marks, registered Copyrights and registered Domain Names, and pending applications for any of the foregoing, that are currently owned by Seller.  Seller does not use any registered Patents, registered Marks (or Marks subject to pending applications), registered Copyrights (or Copyrights subject to pending applications), or registered Domain Names in the operation of the Business that are owned by any Person other than Seller.

(b)    Seller is the sole and exclusive owner of all right, title, and interest in and to Seller Intellectual Property, free and clear of all Security Interests or Liability or other adverse claims or restrictions on, or imperfections of, title or transfer of any nature whatsoever, other than the Lender's Secured Claim.  Upon the Closing, Buyer shall receive all rights, title and interests in and to Seller Intellectual Property, free and clear of all Security Interests or Liability or adverse claims or restrictions on, or imperfections of, title or transfer of any nature whatsoever.

(c)    All assignments and other instruments necessary to establish, record, and perfect Seller's ownership interest in Seller Intellectual Property have been validly executed, delivered, and filed with the relevant Governmental Entities and authorized registrars.  <u>N</u>o loss or expiration of any Seller Intellectual Property is pending or threatened.

(d)    As of the date hereof and within the last five (5) years, (i) none of Seller Intellectual Property and/or Intellectual Property Rights infringes upon, misappropriates, or otherwise violates the rights of any other Person nor is Seller Intellectual Property infringed upon, misappropriated, or otherwise violated by any other Person or its property; (ii) Seller has not received any claim, any cease and desist or equivalent letter or any other written notice of any allegation that any of Seller Intellectual Property infringes upon, misappropriates, or otherwise violates the Intellectual Property of any other Person; (iii) there has been no unauthorized use or disclosure of Seller Intellectual Property to or by any current or former licensee, distributor, independent contractor, consultant, or agent of Seller; (iv) none of Seller Intellectual Property is subject to any suits, actions, claims, or demands of any Person and no action or proceeding, whether judicial, administrative or otherwise, has been instituted, is pending, or is threatened, that challenges or affects the rights of Seller in and to Seller Intellectual Property, except as set forth on Schedule 3.8(d) of the Disclosure Schedule; and (v) Seller has not received any written opinions of counsel (outside or inside) relating to infringement, invalidity, or unenforceability of any of Seller Intellectual Property.

(e)    (i) all registrations with and applications to Governmental Authorities in respect of Seller Intellectual Property are valid and in full force and effect, (ii) Seller is in compliance with all applicable Laws regarding the manufacture, advertising, sale, import, and export of Seller Intellectual Property, and (iii) Seller is not in default (or with the giving of notice or lapse of time or both, would be in default) in any material respect under any of Seller Intellectual Property.

(f)     Upon the Closing, Buyer shall have acquired all Intellectual Property and/or other rights with respect to all of Seller Intellectual Property, including, without limitation, the rights, if any, to: (i) sue for (and otherwise assert claims for) and recover damages and obtain any and all other remedies available at law or in equity for any past, present or future infringement, misappropriation, or other violation of any of such Seller Intellectual Property (and to settle all such suits, actions, and proceedings); (ii)  seek protection therefor (including, without limitation, the right to seek and obtain copyright, trademark and service mark registrations, and letters patent in the United States and all other countries and governmental divisions); and (iii) claim all rights and priority thereunder.

(g)     The Intellectual Property Documentation provided to Buyer is a true, correct, and complete set of documentation evidencing Seller's right, title, and interest in and to the Intellectual Property Rights associated with the Acquired Assets.  Further, no filings with relevant trademark offices, copyright offices, and/or any other similar office or agency are necessary within ninety (90) days after the date of this Agreement to maintain or renew and not abandon Seller Intellectual Property.

(h)     There have been no assignments, undertakings, covenants not to sue, or grants of any license of any kind relating to any Seller Intellectual Property except as set forth on Schedule 3.8(h)  of the Disclosure Schedule.

(i)     (i) No former or current employees, agents, consultants or independent contractors who have contributed to or participated in the conception and development of Seller Intellectual Property and/or Intellectual Property Rights (collectively, "**Contributors**"), has any claim against Seller or any of its Affiliates in connection with such Contributor's involvement in the conception and development of any such Seller Intellectual Property and/or Intellectual Property Rights, and, (ii) no such claim has been asserted or is threatened.  All Contributors contributed to the development of Seller Intellectual Property either (A) within the scope of their employment or (B) pursuant to written agreements assigning all such subject matter and all related Intellectual Property arising therefrom to Seller.

(j)     After the Closing, no third party Mark application or registration existing as of the Closing will prevent Buyer from, after the Closing, obtaining and maintaining registrations for the "AIWA" word mark and AIWA Logo in the United States in any class and in all the jurisdictions where Seller currently has registrations and owning all Intellectual Property Rights in and to the Intellectual Property.

(k)     The operation of the Business by Seller as presently conducted and as contemplated to be conducted by Buyer after the Closing, including the use of Seller's Intellectual Property in connection therewith, and the products, processes, and services of Seller, does not infringe, misappropriate or otherwise conflict with any Intellectual Property right of any other Person.

(l)     Ltd is not currently selling any AIWA goods in the U.S., and, to Seller's knowledge, does not have any plans to do so.

(m)    All the parties to the Settlement Agreement are in compliance with the terms of the Settlement Agreement, including, without limitation, completing all Required Actions, as that term is defined in the Settlement Agreement, and abiding by all quality control provisions.

(n)    Seller and B.V. are in compliance with the terms of the B.V. License, including, without limitation, abiding by all quality control provisions.  Seller believes that Cybo Global LTd., Media Electronics, S.L. and certain other parties may be infringing upon the Intellectual Property by using the AIWA Logo in Europe, and Buyer will have the right to pursue such claim or seek appropriate remedies against those third parties.

(o)    Schedule 3.8(o) sets forth the goods and jurisdictions where B.V. is selling under the B.V. License.

(p)    To Seller's knowledge, the parties to the Distribution Agreements are in compliance with the terms of those Agreements.

(q)    Seller's use of the AIWA Logo has not, and Buyer's use of the AIWA Logo will not, infringe Ltd's Copyright.  Seller reasonably believes that Ltd's Copyright is invalid.

Section 3.9.    Compliance with Laws; Litigation; Acquired Contracts. Except as excused by the Bankruptcy Court or in connection with the Case, Seller is in compliance with, and since Seller's formation has been in compliance with, all applicable Laws relating to the Business or the Acquired Assets and all Acquired Contracts. Except for Rights of Action filed in the Bankruptcy Court, there is no Action, and during the past three (3) years there has been no Action, by or against Seller pending or threatened, including without limitation Actions relating to false advertising, consumer protection, infringement, and/or product liability.  There are no outstanding orders, writs, judgments, decrees, injunctions, or settlements issued by any Governmental Authority rendered against the Business or Seller that could affect Buyer's use and enjoyment of the Acquired Assets in the manner and to the same extent as currently used and enjoyed by Seller.  Except as set forth on Schedule 1, there are no licenses or other agreements from the Seller granting any third party the right to use any of the Intellectual Property.  Each of the Acquired Contracts is in full force and effect. There are no monetary defaults under any Acquired Contract. Seller has no knowledge of any claims, offsets or defenses by any counterparties to Acquired Contracts, nor does Seller have any knowledge of any defaults or breaches under any Acquired Contracts.  The obligations of Seller under the Acquired Contracts which are to be performed on or before the Effective Date have been performed and completed in accordance with the terms thereof.

Section 3.10.    Inventory.  Other than the Lender's Secured Claim, Seller owns, free and clear of any Security Interest, the Inventory, which is in good and marketable condition, free of any defects.  The Inventory was acquired or produced and maintained, in the ordinary course of the conduct of the Business consistent with past practices, in connection with the Business, and is of a quality and quantity usable or salable in the ordinary and normal course of business in connection with the Business.

Section 3.11.   <u>Absence of Certain Business Practices</u>.  Seller has not given or agreed to give any gift or similar benefit to any customer, supplier, employee of any Governmental Authority, or any other Person that could reasonably be expected to subject the Acquired Assets to any penalty in any civil, criminal, or governmental litigation or proceeding that might subject Seller to suit or penalty in any private or governmental litigation or proceeding including the Foreign Corrupt Practices Act.

Section 3.12.   <u>Taxes</u>.  Since the applicable statute of limitations, all tax returns with respect to the Business and the Acquired Assets on or before the Closing Date have been or will be timely filed in accordance with any applicable Laws.  Since statute of limitations, all taxes (whether or not shown to have become due under such tax returns) payable by Seller with respect to or attributable to the Business and the Acquired Assets have been or will be timely paid in full. Since statute of limitations, no dispute, audit, investigation, proceeding, claim, or other action concerning any taxes or tax returns of Seller with respect to the Business or the Acquired Assets is pending or being conducted, or has been threatened or raised by any Governmental Authority.   Since statute of limitations, no claim has ever been made by a Governmental Authority in a jurisdiction where Seller (or its direct or indirect owners) did not file tax returns or in a jurisdiction where Tax Returns are not filed with respect to the Business or the Acquired Assets that Taxes should be paid or Tax Returns should be filed in such jurisdiction, and there is no basis for any such claim to be made.   Since statute of limitations, all Taxes required to be deducted, withheld, or paid by Seller (or its direct or indirect owners) with respect to the Business or the Acquired Assets in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, partner, or other Person have been so deducted, withheld, or paid, and Seller has complied with all related recordkeeping requirements.  There are no liens with respect to Taxes upon the Acquired Assets, except with respect to current Taxes not yet due and payable.  Neither the Business nor any Acquired Asset will result in Buyer or any of its Affiliates having any Liability or obligation to pay, reimburse, or indemnify any Person for any Taxes of any other Person.

Section 3.13.   <u>Warranty Claims</u>. Neither Seller nor any insurance company nor other third party acting on Seller's behalf has, since January 1, 2019, paid any amount or damages to any third party for deaths of or injuries to Persons or damage to property, or for breach of warranty in excess of $10,000 arising out of any alleged defect in quality, materials, workmanship or design of any of the products sold or services performed by Seller.  There are no presently pending, nor, to the Knowledge of Seller, threatened, civil, criminal or administrative actions, suits, demands, claims, hearings, notices of violation, inquiries, investigations, proceedings or demand letters relating to any alleged hazard or alleged defect in design, labeling, testing, manufacture, materials or workmanship, including, without limitation, any failure to warn or alleged breach of express or implied warranty or representation, relating to any product manufactured, distributed or sold by or on behalf of Seller or the Business, including, without limitation, the Acquired Inventory. Since January 1, 2019, Seller has not issued a product recall, concerning any product of the Business manufactured, shipped, sold or delivered by Seller. <u>Schedule 3.13</u> set forth an accurate and complete list of all warranty claims and returns currently pending.

Section 3.14.   <u>Suppliers</u>. <u>Schedule 3.14</u> sets forth the five largest (by dollar volume) suppliers of Seller during the 12-month period ended March 31, 2021.  Except as set forth on

Schedule 3.14, there are no minimum purchase contracts or understandings between either Seller, on the one hand, and its respective suppliers, on the other hand. Seller has neither given nor to Seller's Knowledge received any notice or proposal from any supplier set forth on Schedule 3.14 requiring or proposing material modifications in the terms on which such Person conducts business with Seller.

Section 3.15.    Related Party Transactions. No Affiliate directly or indirectly owns, on an individual or joint basis, any material interest in, nor serves as an officer or director or in another similar capacity of, any competitor, distributor or supplier of, the Business or any organization that has a written contract with the Business.

Section 3.16.    Bankruptcy Schedules.  Seller has delivered, or caused to be delivered to Purchaser or its counsel, a true, correct and complete copy of the Schedules of Assets and Liabilities that have been filed by Seller with the Bankruptcy Court, together with all amendments thereto.

**ARTICLE IV**
**Representations and Warranties of Buyer**

Buyer represents and warrants to Seller that the statements contained in this Article IV are correct and complete as of the date of this Agreement.

Section 4.1.    Organization of Buyer.   Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the jurisdiction of its organization.

Section 4.2.    Authorization of Transaction.  Buyer has the requisite power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance by Buyer of this Agreement and each Ancillary Agreement to which it is a party have been duly authorized by all requisite limited liability company action on the part of Buyer.  Assuming due authorization, execution, and delivery by Seller, this Agreement constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights and remedies generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.3.    Non-contravention.  Neither the execution and the delivery by Buyer of this Agreement, nor the consummation by Buyer of the transactions contemplated hereby (including the assignments and assumptions contemplated hereby), will (i) violate the limited liability company agreement of Buyer; (ii) violate any Law applicable to Buyer; or (iii) result in any material breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, require any consent of any Person pursuant to, or give to others any rights of termination, acceleration or cancellation of, any material contract or agreement to which Buyer is a party.

Section 4.4.    <u>Consents</u>.    Buyer is not required to file, seek, or obtain any notice, authorization, approval, order, permit, or consent of or with any Governmental Authority in connection with the execution, delivery, and performance by Buyer of this Agreement and each of the Ancillary Agreements to which Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

Section 4.5.    <u>Brokers' Fees</u>.    Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

Section 4.6.    <u>Litigation</u>.    There is no Action by or against Buyer or pending or threatened against Buyer that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.

**ARTICLE V**
**<u>Covenants of Seller</u>**

Section 5.1.    <u>Press Releases and Public Announcements</u>.    Unless otherwise required by applicable Law or stock exchange requirements, Seller shall not, nor permit or allow any of its Affiliates to, make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of Buyer in its sole and absolute discretion.    Notwithstanding the foregoing, the Parties shall agree to issue a joint press release mutually acceptable to both Parties following the Closing.

Section 5.2.    <u>Further Assurances; Power of Attorney</u>.    In connection with this Agreement and the transactions contemplated hereby, Seller  shall use commercially reasonable efforts to (i) execute and deliver any additional documents and instruments and (ii) perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated hereby, including without limitation assisting Buyer with facilitating the transfer to Buyer of all Intellectual Property and/or Domain Names registered by any licensee of Seller as of the Closing.    Without limiting the generality of the foregoing, from time to time following the Closing, Seller shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases, and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers, and privileges intended to be conveyed to Buyer under this Agreement and the Ancillary Documents, and to otherwise make effective the transactions contemplated hereby and thereby.    If, following the Closing, Seller receives or becomes aware that they hold any property, right, claim, demand, or asset which constitutes an Acquired Asset, then Seller shall transfer such property, right, claim, demand, or asset to the Buyer as promptly as practicable for no additional consideration.    Seller hereby appoints Buyer the Seller's attorney-in-fact, with full authority to act in the place and stead of the Seller and in the name of the Seller, to execute any assignment or transfer instrument or document which is necessary or required by any Governmental Authority to transfer the trademarks included in the Acquired Assets to Buyer; provided that Buyer may not initiate any legal action on behalf of Seller, nor settle, compromise or waive any rights of Seller with respect to any claims or rights Seller may assert against third parties. The Seller agrees that the Buyer shall not have any liability for any acts of

commission or omission, or for any error of judgment or mistake of fact or law, with respect to the exercise of the powers of attorney granted under this Section 5.2**,** unless such liability shall be due to the willful misconduct of the Buyer.  The powers of attorney granted under this Section 5.2 are coupled with an interest and shall be irrevocable, and shall survive the Closing.

Section 5.3.    <u>Confidentiality</u>.  Seller agrees to, shall cause its Affiliates to, and shall use best efforts to cause each of its respective officers, directors, employees, agents, members, advisors, and representatives to, unless compelled to disclose by Law, treat and hold as confidential all written and oral documentation, materials, and information relating, directly or indirectly, to the Acquired Assets, including any notes or other documents that are derived from, contain, reflect, or are based upon any such information, and including the terms of this Agreement (the "**Confidential Information**") and refrain from using any Confidential Information except in connection with this Agreement, and deliver promptly to Buyer, at Buyer's request, all Confidential Information (and all copies thereof in whatever form or medium) in its possession or under its control.  Notwithstanding the foregoing, Confidential Information shall not include information that (i) prior to the Effective Date, was available publicly, or (ii) is lawfully acquired by Seller, its Affiliates, or its representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation.  In the event that Seller or any of its agents, representatives, Affiliates, employees, members, advisors, officers, or directors becomes compelled by Law to disclose any Confidential Information, is otherwise required to disclose any Confidential Information pursuant to applicable Law (including, without limitation, in connection with the preparation and filing of returns and forms relating to Taxes), such Person shall, to the extent permitted by applicable Law, provide Buyer with prompt written notice of such requirement so that Buyer may (at its sole cost and expense) seek a protective order or other remedy or waive compliance with the provisions of this Section 5.3.  In the event that a protective order or other remedy is not obtained or if Buyer waives compliance with this Section 5.3, such Person shall furnish only that portion of such Confidential Information that is legally required to be provided and exercise its commercially reasonable efforts, at Buyer's sole cost and expense, to obtain assurances that confidential treatment will be accorded such information.

Section 5.4.    <u>Retention of Books and Records</u>.  Seller shall preserve and keep its books and records relating to the Acquired Assets for a period of three (3) years from the Closing Date and shall make such books and records available to Buyer (and permit Buyer and its representatives to make extracts and copies of such books and records) as may be reasonably required by Buyer in connection with, among other things, use of Seller's Intellectual Property, any insurance claims by, Actions, Tax audits, or investigations by Government Authorities of Seller or its Affiliates.  In the event Seller desires to destroy such records during such three (3) year period, Seller shall first give Buyer thirty (30) days' prior written notice and Buyer shall have the right at its option and expense, upon prior written notice given to Seller within that thirty (30) day period, to obtain copies of such documents, which thereafter shall be treated as Confidential Information.

Section 5.5.    <u>Intellectual Property Documentation</u>.  Prior to the Closing, Seller shall deliver, or cause to be delivered, if in its possession or control (including, without limitation, the possession or control of its counsel), the following (collectively, "**Intellectual Property Documentation**") (a) all original filings and copies concerning the Marks with the United States

Patent and Trademark Office and any other agency, registry, or filing office of any country or agency so established to record ownership in the Marks (including, without limitation, any filings, registrations, applications, recording, assignments, communications, refusals, or denials or certificates in connection therewith), (b) all original filings and copies concerning the Copyrights with the United States Copyright Office and any other agency, registry, or filing office of any country or agency so established to record ownership in the Copyrights (including, without limitation, any filings, registrations, applications, recording, assignments, communications, refusals, or denials or certificates in connection therewith), and (c) any other documents, instruments, notices, certificates, or agreements relating to the Intellectual Property Rights and Seller's ownership in and to the Intellectual Property.

Section 5.6.    <u>Warranty Claims; Returned Merchandise</u>. Seller shall on a weekly basis provide Buyer with a detailed list of all warranty claims and returns arising with respect to sales occurring prior to the Closing.  Buyer shall have the option, but not the obligation, to service all such claims and returns.  To the extent any products sold by Seller prior to the Closing are returned to Seller, Seller shall not re-sell such products and shall either sell such products to Buyer or destroy such products.

Section 5.7.    <u>Entry of Sale Order</u>.

(a)    As soon as practicable after the date hereof, Seller shall file a copy of this Agreement and a form of Sale Order with the Bankruptcy Court.

(b)    In the Sale Motion, Seller shall use its reasonable, good faith efforts to obtain prompt Bankruptcy Court approval of bidding procedures, including a Breakup Fee and non-solicitation and minimum bid requirements.

(c)    Buyer and Seller shall cooperate with prosecuting the Sale Motion and obtaining entry of the Sale Order, and Seller shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel for review and comment, the proposed form of Sale Order and copies of all proposed pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed by Seller in connection with the Sale Motion and the relief requested therein.

Section 5.8.    <u>Bidding and Breakup Fee</u>.

(a)    Seller and Buyer recognize that Buyer's offer herein is subject to higher or better offers which may be approved by the Bankruptcy Court (the "**Third Party Proposal**").

(b)    Seller shall give Buyer a notice of hearing on approval of any Third Party Proposal so that Buyer will have the opportunity, but not the obligation, to make a competitive bid.

(c)    Bidding requirements will be in the form attached hereto as Exhibit J, and shall in any event provide that: (i) the initial bid must be no less than $6,200,000 of Assured Consideration and thereafter bidding increments shall be in multiples of no less

than Twenty-Five Thousand Dollars ($25,000); (ii) all other bidding requirements must be acceptable to Buyer and its counsel; and (iii) if the Third Party Proposal is accepted and/or approved (regardless of whether such Third Party Proposal has a total purchase price greater than the Purchase Price, Buyer shall be paid a breakup fee in the amount of three percent (3%) of the Purchase Price (other than the Bonus Payment) (the "**Breakup Fee**") no later than the date of the closing of the sale to the successful bidder upon receipt of which the transaction contemplated by this Agreement will terminate and the parties shall have no further obligations to each other. "**Assured Consideration**" shall mean all cash and cash equivalents but shall exclude any contingent consideration such as royalty-based payments and any other consideration based on the profitability of Buyer's business or valuation of the Acquired Assets following the Closing.

Section 5.9.   Survival of Covenants.   The covenants set forth in this Agreement, including Sections 5.1 through 5.8 shall survive the Closing.

# ARTICLE VI
## Covenants of Buyer

Section 6.1.   Press Releases and Public Announcements.   Prior to the Closing, unless otherwise required by applicable Law or stock exchange requirements, Buyer shall not, or permit or allow any of its Affiliates to, make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of Seller (which consent shall not be unreasonably conditioned, withheld, or delayed). From and after the Closing, Buyer may issue press releases and make public announcements reasonably related to the commercial exploitation of the Assigned Assets, provided that Buyer may disclose such information relating to this Agreement and the transactions contemplated herein if required to do so by Law or applicable governmental regulation. Notwithstanding the foregoing, the Parties shall agree to issue a joint press release mutually acceptable to both Parties following the Closing.

Section 6.2.   Further Assurances.   In connection with this Agreement and the transactions contemplated hereby, Buyer shall use commercially reasonable efforts to (i) execute and deliver any additional documents and instruments and (ii) perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and the transactions contemplated hereby. Notwithstanding anything contained in this Section 6.2 to the contrary, Buyer shall not be required to initiate any litigation, make any substantial payment, or incur any material economic burden in connection with its obligations under this Section 6.2.

Section 6.3.   Survival of Covenants.   The covenants set forth in Sections 6.1 and 6.2 shall survive the Closing.

# ARTICLE VII
## Duties to Creditors

Section 7.1.   Buyer's Obligations.   Buyer is not assuming in any manner any Liabilities of Seller, including, without limitation, any Liabilities and/or Claims by Seller's creditors whatsoever. The maximum amount that Buyer is required to pay shall not exceed the Purchase Price.

## ARTICLE VIII

Section 8.1.     <u>Termination of Agreement</u>. This Agreement may be terminated prior to the Closing only as follows:

(a)     By mutual written consent of Buyer and Seller;

(b)     By Buyer if the Closing shall not have occurred on or before October 31, 2021 which date may be extended an additional thirty (30) days by consent of the Buyer; provided, however, that if the Closing shall not have occurred on or before October 31, 2021 due to a breach of this Agreement by Buyer, the Buyer may not terminate this Agreement pursuant to this <u>Section 8.1(b)</u>.

(c)     By any party not in breach of this Agreement, if there shall be any Law or regulation that makes the Contemplated Transaction hereby illegal or otherwise prohibited or if the Contemplated Transaction would violate any nonappealable Final Order;

(d)     By Buyer, if the Bankruptcy Court approves an Third Party Proposal, subject to Buyer's right to payment of the Breakup Fee in cash, by wire transfer of immediately available funds to an account designated by Buyer, on the Business Day following the date of the consummation of any Third Party Proposal; or

(e)     By Seller, on the one hand, or Buyer, on the other, if Buyer or Seller, as the case may be, materially breach any of its obligations under this Agreement, unless such breach shall be cured within five (5) Business Days after such other party shall have received notice of such breach in accordance with the terms hereof.

Section 8.2.     <u>No Liabilities in Event of Termination</u>. Except with respect to the Breakup Fee payable in the event of termination pursuant to Section 8.1(d) hereof, in the event of termination of the Agreement pursuant to Section 8.1(a) – (c) and (e), written notice thereof shall as promptly as practicable be given to the other party specifying the provision hereof pursuant to which such termination is made, this Agreement shall terminate and be of no further force and effect, and there shall be no liability on the part of Buyer or Seller.

## ARTICLE IX
### <u>Closing</u>

Section 9.1.     <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically (via email) and will be effective no later than one (1) Business Day following the date the Sale Order becomes a final order (the "**Closing Date**").

Section 9.2.     <u>Conditions to Closing</u>.

(a)     <u>Deliveries by Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer a duly executed copy of (i) this Agreement, (ii) the Assignment Agreement, (iii) the Bill of Sale, (iv) Trademark Assignments, (v) Copyright Assignment, (vi) Patent Assignment, (vii) Seller's Closing Certificate; (viii) payoff letters with respect to the Lender Secured Claim

outstanding as of the Closing, including lien releases, (ix) payoff letters with respect to the Economic Injury Disaster Loan, and (x) the consents of each of (A) the Board of Directors of the Seller, (B) the stockholders of Sellers and (C) holders of each evidence of indebtedness of the Company (other than the Lender Secured Claim and the Economic Injury Disaster Loan).

(b)    <u>Deliveries by Buyer</u>:  At the Closing, Buyer shall deliver to Seller a duly executed copy of (i) this Agreement, (ii) Buyer's Closing Certificate, and (iii) the Employment Agreement.

(c)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order; and the Sale Order (i) shall be in form acceptable to Buyer in its sole and absolute discretion and (ii) shall be a Final Order.  The Sale Order shall approve the sale of the Acquired Assets free and clear of all Security Interests and, <u>inter</u> <u>alia</u>, any claims or liabilities of Seller including successors or assigns.

(d)    <u>Bankruptcy Case</u>. The Case shall not have been dismissed.

Section 9.3.    <u>Transfer of Title</u>.  At the Closing, (a) Seller shall convey to Buyer all right, title, and interest in and to the Acquired Assets, free and clear of any Security Interests and Liabilities, and (b) title to all of the Acquired Assets shall pass to Buyer, and Seller shall make available to Buyer possession of all of the tangible Acquired Assets.

Section 9.4.    <u>Post-Closing Actions</u>.  Promptly following the Closing, (a) Seller shall deliver to Buyer the Intellectual Property Documentation, (b) Seller shall make available to Buyer upon reasonable prior written notice, from and after the Closing, and, as reasonable and appropriate, all of the books and records held by Seller directly relating to the Acquired Assets, and permit Buyer to review and make copies as reasonable and appropriate.

**ARTICLE X**
**<u>Miscellaneous</u>**

Section 10.1.    <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.  No third-party beneficiaries are intended or shall be created by any provision hereof.

Section 10.2.    <u>Entire Agreement</u>.  This Agreement (including the Ancillary Agreements and the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

Section 10.3.    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party and any such attempted assignment without such prior written approval shall be null and void; *provided*, *however*, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates, including simultaneously with execution of this Agreement, so that said rights and interests are directly received by its designated Affiliate or Affiliates, and (ii) designate one or

more of its Affiliates to perform its obligations hereunder (in any or all of which cases such designated Affiliate or Affiliates is primarily and solely responsible for the performance of all of its obligations hereunder.

Section 10.4.   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

Section 10.5.   <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 10.6.   <u>Notices</u>.  All notices required by this Agreement shall be in writing and shall be deemed to have been received (i) immediately if sent on a business day by hand delivery (with signed return receipt), or by email or telecopier transmission; provided, however, that if such email or telecopier transmission is received on a non-business day or on a business day after 5:00 p.m., Central Time, then it shall be deemed received on the next proceeding business day, or (ii) the next business day if sent by nationally recognized overnight courier, in any case to the respective addresses as follows:

(a)      If to Seller:   Aiwa Corporation
965 W. Chicago Avenue
Chicago, Illinois 60642
Attention:  Joseph Born, Chief Executive Officer
jborn@aiwa.co

With a copy to:  Jeremy Kleinman
FrankGecker LLP
1327 West Washington Blvd. Suite 5 G-H
Chicago, IL 60607
Email: jkeinman@fgllp.com

(b)      If to Buyer:   c/o Sakar International, Inc.
195 Carter Dr
Edison, NJ 08817
Attn: Ralph Sasson
Email: rsasson@sakar.com

With a copy to:  Wachtel Missry LLP
885 Second Avenue, 47th Floor
New York, New York 10017
Telephone: 212-909-9500
Email: missry@wmllp.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

Section 10.7.   <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Illinois.

Section 10.8.   <u>Amendments and Waivers</u>.   No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.   No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

Section 10.9.   <u>Severability</u>.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 10.10.   <u>Expenses</u>.   Each of Buyer, on the one hand, and Seller, on the other hand, will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 10.11.   <u>No Presumption Against the Drafting Party</u>.   The Parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 10.12.   <u>Construction</u>.   As used herein, singular shall include the plural, the masculine gender shall include the feminine and neuter and the neuter gender shall include the masculine and feminine unless the content otherwise indicates.   Information contained in any Schedule shall be deemed contained in each and every other Schedule without requiring repetition thereof.   The terms "include," "includes" and "including" shall be deemed to be followed by "without limitation."   As used herein, the term "will" means "shall" and vice versa. Any date specified for action that is not a Business Day shall mean the first Business Day after such date.   Any reference to a Person shall be deemed to include such Person's successors and permitted assigns.   References to money refer to legal currency of the United States of America. Unless expressly stated otherwise, whenever a Person is to determine that something is "satisfactory to," "acceptable to," or "to the satisfaction of" such Person, the determination may not be made in bad faith.

Section 10.13.   <u>References</u>.   References to Sections are intended to refer to Sections of this Agreement, and all references to Exhibits and Schedules are intended to refer to Exhibits and Schedules attached to this Agreement, each of which is made a part of this Agreement for all

purposes. Any reference to any document or documents shall be deemed to refer to such document or documents as amended, modified, supplemented, or replaced from time to time in accordance with the terms thereof. References to Laws refer to such Laws as they may be amended from time to time, and references to particular provisions of a Law include any corresponding provisions of any succeeding Law. The words "herein," "hereof," and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or subsection of this Agreement.

Section 10.14. <u>Submission to Jurisdiction</u>. Each of the Parties submits to the jurisdiction of any state or federal court sitting in the Northern District of Illinois, in any action or proceeding arising from or relating to this Agreement or the Ancillary Agreements and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each Party also agrees not to bring any action or proceeding arising from or relating to this Agreement or the Ancillary Agreements in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto. Any Party may make service on the other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 10.6 above. Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity.

Section 10.15. <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.16. <u>Specific Performance</u>. The Parties agree that if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, irreparable damage would occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that the Parties shall be entitled to full specific performance and enforcement of the terms contained herein, in addition to other remedies provided herein. Each Party hereto (i) agrees that it shall not oppose the granting of such specific performance or relief and (ii) hereby irrevocably waives any requirement for the security or posting of any bond in connection with such relief.

Section 10.17. <u>Guaranty</u>. Sakar International, Inc. ("<u>Guarantor</u>"), hereby unconditionally guarantees to the Seller, as a primary obligor and not merely as a surety, the payment obligations required to be performed by Buyer, including pursuant to <u>Section 2.3</u> (the "<u>Guaranteed Obligations</u>"). This guarantee is an absolute, unconditional and continuing guarantee of the payment of the Guaranteed Obligations. Should Seller default in the payment of the Guaranteed Obligations as and when due, Guarantor's obligations hereunder shall become due and payable to Buyer. All amounts payable by the Guarantor will be paid in immediately available funds. Guarantor hereby agrees that the obligations of Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (a) the failure of Seller to assert any claim or demand or to enforce any right or remedy against Buyer; (b) any change in the time, place or manner of payment of the Guaranteed Obligations; (c) any change in the corporate

existence, structure or ownership of Buyer; or (d) the adequacy of any other means Buyer may have of obtaining payment of the Guaranteed Obligations.  To the fullest extent permitted by law, Guarantor hereby expressly waives any and all rights or defenses arising by reason of any law that would otherwise require any election of remedies by a Buyer Party.  Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by this Agreement and that the waivers set forth in this guarantee are knowingly made in contemplation of such benefits.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

<u>**SELLER**</u>

**AIWA CORPORATION**,
a Delaware corporation


By: _____
         Joseph Born, Chief Executive Officer


<u>**BUYER**</u>

**AIWA ACQUISITIONS LLC**,
a Delaware limited liability company


By:_____
Name:_____
Title:_____



**Agreed with respect to Section 10.17 only:**

**SAKAR INTERNATIONAL, INC.**,
a Delaware corporation


By:_____
Name:_____
Title:_____

**Exhibits**

| | |
|---|---|
| Exhibit A | Assignment Agreement |
| Exhibit B | Bill of Sale |
| Exhibit C | Trademark Assignments |
| Exhibit D | Copyright Assignment |
| Exhibit E | Patent Assignment |
| Exhibit F | Intentionally Omitted |
| Exhibit G | Seller Closing Certificate |
| Exhibit H | Buyer Closing Certificate |
| Exhibit I | Employment Agreement |

**Purchase Schedules**

| | |
|---|---|
| Schedule 1 | Acquired Contracts |
| Schedule 2 | Seller Intellectual Property |
| Schedule 3 | Creditors' List |

**Disclosure Schedules**

| | |
|---|---|
| Schedule 3.7 | Title |
| Schedule 3.8(d) | Intellectual Property |
| Schedule 3.8(h) | Intellectual Property |
| Schedule 3.8(o) | BV License Products and Territory |
| Schedule 3.13 | Warranty Claims |
| Schedule 3.14 | Vendors |

## Exhibit A
**Assignment Agreement**

(See attached)

**<u>Exhibit B</u>**
**Bill of Sale**

(See attached)

**<u>Exhibit C</u>**
**Trademark Assignments**

(See attached)

**<u>Exhibit D</u>**
**Copyright Assignment**

(See attached)

## **Exhibit E**
### **Patent Assignment**

(See attached)

**<u>Exhibit F</u>**
Omitted

## **<u>Exhibit G</u>**
**Seller Closing Certificate**

(See attached)

## <u>Exhibit H</u>
## Buyer Closing Certificate

(See attached)

**<u>Exhibit I</u>**
**Employment Agreement**

(See attached)

**<u>Exhibit J</u>**
**Bidding Procedures**

(See attached)

**Schedule 1**
**Acquired Contracts**

(1)     June 15, 2020 Settlement and Mutual Release Agreement between Towada Audio Co.,
        Ltd. and Aiwa Co., Ltd. on the one hand and Aiwa Corporation, Hale Devices, Inc., River
        West Brands LLC, Dormitus Brands LLC, Mark Thomann and Joseph Born on the other.

(2)     November 1, 2020 Trademark (Sub-)License Agreement between Aiwa Corporation and
        Aiwa Europe B.V. ("B.V.").

(3)     August 1, 2017 Trademark Co-Existence Agreement between Aiwa Corporation and
        Audio Mobile Americas, S.A.

(4)     Mutual Termination and Release Agreement dated April 6, 2018 between AIWA
        Corporation and Mark Thomann

**Schedule 2**
**Seller Intellectual Property**

A.    **Marks**

**UNITED STATES**

| Mark | Class(es) | Filing Date<br><br>Serial # | Date Issued<br><br>Registration # | Status<br><br>§ 8 Due<br>§ 15 Due<br>Renewal Due |
|------|-----------|-----------------------------|-----------------------------------|----------------------------------------------------|
| aiwa | 9 | Jan. 23, 2017<br>87/977,686 | Jul. 17, 2018<br>5,521,299 | Registered<br>§ 8 Due & § 15 Due<br>Jul. 17, 2024 |
| AIWA | 9 | Jan. 11, 2017<br>87/977,687 | Jul. 17, 2018<br>5,521,300 | Registered<br>§ 8 Due & § 15 Due<br>Jul. 17, 2024 |
| AIWA | 9 | Aug. 22, 2013<br>86/044,675 | Feb. 10, 2015<br>4,685,532 | Registered<br>Renewal Due<br>Feb. 10, 2025 |
| AIWA | 7, 11 | Jun. 15, 2020<br>90/001,760 | | Suspended |

**Foreign Jurisdictions**

| Country | Mark | Class | Filing Date<br>Serial # | Date Issued<br>Registration # | Status<br>Renewal Due |
|---------|------|-------|-------------------------|-------------------------------|-----------------------|

| EUTM | AIWA | 37 | 18-Jun-2020<br>018256222 | 1-Feb- 2021<br>018256222 | Registered<br>Next Renewal Due<br>18-Jun-2030 |
|---|---|---|---|---|---|
| EUTM | AIWA | 9 | 30-Oct-2015<br>014755037 | 01-Mar 2016<br>14755037 | Registered<br>Next Renewal Due<br>30-Oct-2025 |
| Poland | AIWA | 9 | 17-May-2018<br>Z.486037 | | Published |
| United Kingdom | AIWA | 37 | 18-Jun-2020<br>UK00003502011 | 18-Jun-20<br>UK000035020<br>11 | Registered<br>Next Renewal Due<br>18-Jun-2030 |
| United Kingdom | AIWA | 9 | 11-Jul-2017<br>00003242803 | 11-Jul-2017<br>00003242803 | Registered<br>Next Renewal Due<br>11-Jul-2027 |
| United Kingdom<br>(Brexit) | AIWA | 9 | 30-Oct-2015<br>UK00914755037 | 01-Mar 2016<br>UK009147550<br>37 | Registered<br>Next Renewal Due<br>30-Oct-2025 |
| France | AIWA | 9 | 18-Aug-2017<br>4383190 | 08-Dec-2017<br>4383190 | Registered<br>First Renewal Due<br>18-Aug-2027 |
| Spain | AIWA | 9 | 17-Aug-2017<br>M3679799 | 15-Feb-2018<br>M3679799 | Registered<br>First Renewal Due<br>17-Aug-2027 |
| Czech Republic | AIWA | 9 | 06-Mar-2018<br>546288 | 14-Nov-2018<br>369586 | Registered<br>First Renewal Due<br>06-Mar-2028 |

| Czech Republic | AIWA | 9 | 31-Jan-2018<br>545497 | | Pending |
|---|---|---|---|---|---|
| Sweden | AIWA | 9 | 04-Jan-2018<br>2018-00063 | 31-Aug-2020<br>551576 | Registered<br>First Renewal Due 31-Aug-2030 |
| WIPO<br>Granted Designated Countries:<br>Armenia, Benelux, Croatia, Hungary, Lichtenstein, Lithuania, Latvia, Moldova, Monaco, Norway, Portugal, Romania, Serbia, Slovenia, Slovakia | AIWA | 9 | 18-Aug-2016<br>1320682 | 18-Aug-2016<br>1320682 | Registered<br>First Renewal Due 18-Aug-2026 |

**B.**   **Patents**

1.   U.S. Patent No. 9,172,787

2.   U.S. Patent No. 9,305,060

**C.**   **Copyrights**

All works capable of copyright protection used or created for use in Seller's business, including, without limitation, (a) all packaging, (b) databases, data collections, and other compilations of information (including without limitation customer lists and customer databases), (c) the content and "look-and-feel" of all web pages, (d) all promotional, advertising, and marketing materials and the content thereof, including without limitation video footage, photography and artwork.

**D.**   **Domain Names**

aiwa.us.com
aiwa.co
aiwa.eu.com
aiwa.at
aiwa.be
aiwasound.com
aiwaaudio.com
aiwaspeakers.com
aiwa-us.com
aiwa.us

**Social Media Accounts:**

https://www.facebook.com/aiwa

Aiwa Labs Facebook Group: https://www.facebook.com/groups/1780747588887338

https://twitter.com/Aiwa_US

https://www.instagram.com/aiwa_audio/

https://www.youtube.com/channel/UCgmhITd4PWvdwg-hM3LkqbQ

All Amazon accounts and all related aspects of the business, including, without limitation:
- https://www.amazon.com/s?me=A14M79FDBNCF7U&marketplaceID=ATVPDKIKX0DER

- Amazon Vendor Seller Central account along with logins

- Merchant ID A14M79FDBNCF7U   (the seller name can change but the merchant Id does not)

- Amazon 3rd Party Account along with the Brand Registry

All eBay accounts and all related aspects of the business, including, without limitation:

- Aiwaus eBay Store and Bay account

- https://www.ebay.com/usr/aiwaus?_trksid=p2047675.l2559


The Domain Names indicated with an (*) above are currently registered in the name of a licensee of Seller.  However, Seller has the right to cause each such licensee to transfer ownership and registration of the Domain Names to Seller (and, after the Closing, to Buyer).

**Schedule 3**
**Creditors' List**

See Attached.